### MACY v. ROEDENBECK.

### In re BANK OF SULLY, IOWA.

(Circuit Court of Appeals, Eighth Circuit. September 21, 1915.)

#### No. 4422.

1. ASSIGNMENTS ☞49—EQUITABLE ASSIGNMENT—BILL OF EXCHANGE—COLLATERAL HELD BY DRAWEE.

A draft issued by a bank in the usual course of business on a correspondent bank, which holds collateral to secure the drawer's account generally, does not, as between the drawer and payee, operate as an equitable assignment of any interest in such collateral.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 85–98; Dec. Dig. ☞49.]

2. BANKRUPTCY ☞345—CLAIMS ENTITLED TO PRIORITY—TRUST FUNDS.

The fact that a bankrupt bank converted and dissipated the proceeds of a note sent to it for collection does not operate to give the owner of the note a lien upon, or right to priority of payment from, the general assets of the bankrupt, to the prejudice of its general creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 531, 532, 534, 539, 540; Dec. Dig. ☞345.]

Appeal from the District Court of the United States for the Southern District of Iowa; John C. Pollock, Judge.

In the matter of the Bank of Sully, Iowa, bankrupt. From an order awarding priority to the claim of Herbert Roedenbeck, E. B. Macy, trustee, appeals. Reversed.

Herbert Roedenbeck filed a reclamation petition with the trustee in bankruptcy, for the purpose of impressing a trust upon the general assets of the bank in the trustee's hands. The referee allowed the claim as a prior claim, to participate with other claims of the same class against the actual cash coming into the hands of the trustee at the time the petition in bankruptcy was filed, together with any additions to that fund which may come into the hands of the trustee from the recovery of voidable preferences, and that when that fund is exhausted the balance of said claim shall be allowed as an unsecured claim against said estate, to participate in any and all dividends declared therein. A petition for review of this order of the referee was filed by said Roedenbeck, and the judge of said court thereafter reversed the decision of the referee and set aside such order and directed the trustee to make payment of the full face value of the petitioner's demand, if the assets of the estate in his hands are sufficient for such purpose. If not, then to pay the same to the extent of the assets in his hands not otherwise by law appropriated, thus impressing such trust upon the entire assets of the bank in the trustee's hands. The trustee appeals.

John E. Cross, of Newton, Iowa, for appellant.

Charles S. Bradshaw, of Des Moines, Iowa, for appellee.

Before HOOK, Circuit Judge, and YOUMANS and ELLIOTT, District Judges.

ELLIOTT, District Judge. Upon the facts, in so far as they are material, there is no controversy. Prior to April 17, 1914, the Bank of Sully, Iowa, was a copartnership, composed of Fred C. Andreas and Frank G. Sherman. Both the copartnership and the individual members thereof, were thereafter, on April 30, 1914, duly adjudged bankrupts, and E. B. Macy qualified as trustee May 13, 1914.

In March, 1914, Herbert Roedenbeck, a resident of Texas, sent by United States mail, for collection, a note for $2,200, given by Emerson Sherman, which note was inclosed in a letter reading as follows:

"Inclosed find warranty deed from Herbert Roedenbeck to Emerson Sherman, of Sully, Iowa, covering the west half of section 67, T. & N. O. survey, Jefferson Co., and also abstract of title and six vendor's lien notes. Further, a promissory note of $2,200 given by Mr. Sherman, dated October 13, 1913, and due on or before March 15, 1914, drawing 7% interest from date until paid. Please surrender the deed to Mr. Sherman as soon as he has paid the amount of the note and interest and has signed the vendor's lien notes, and also surrender to us his copy of the purchase contract. Kindly send us draft for the amount of the collection, signed vendor's lien notes, and surrender purchase contract to this office."

April 17, 1914, the Bank of Sully collected the amount due on the note, $2,278.72, receiving in payment a check for the sum of $2,466, drawn by Meredith & Meredith, on the First National Bank of Newton, Iowa, payable to John H. Sherman, and by him indorsed, in blank, and delivered to the said Bank of Sully, receiving either cash or credit for the balance from the bank, the deed, abstract,

and. note above referred to. On April 17, 1914, on receipt of the Meredith & Meredith check, the cashier of the Bank of Sully drew its draft on its correspondent, the Iowa National Bank of Des Moines, in favor of Theodore B. Koch & Co., Roedenbeck's agents, for $2,-278.72, and inclosed the draft with its statement, as follows:

"We herewith enclose our draft, No. 2238, on Iowa National Bank, for $2,278.72, in payment of the following collections:

Emerson Sherman.........................................$2,200.00
Interest .............................................. 78.72

Total collected.......................................$2,278.72
Amount remitted....................................... $2,278.72"

—and mailed the same to said company at Houston, Tex. This draft was, upon the receipt thereof, deposited by Roedenbeck, April 20, 1914, in the Union National Bank of Houston, Tex., forwarded by said bank to its St. Louis correspondent for collection, and from there forwarded to the Iowa National Bank of Des Moines, where it was presented, dishonored, and protested April 25, 1914. By the time the draft was returned to Roedenbeck, the Bank of Sully had closed its doors, the petition in bankruptcy having been filed against said bank on April 28, 1914, and he has never received any part of his claim against said bank therefor, though demand has been duly made.

As shown by the books of the Bank of Sully, its account with the Iowa National Bank, at the close of business April 16, 1914, was overdrawn $164.60; April 17th, $2,456.22; 18th, $2,456.60; 20th, $2,471.36; 21st, $6,144.66.; 22d, $6,465.71; 23d, $6,497.73; 24th, $7,173.71; 25th, $6,492.84; 27th, $6,592.84. At the time the draft to Roedenbeck was drawn, the said Iowa National Bank held collateral of the Bank of Sully, under an arrangement that it should be in the sum of not less than $8,000, and when such draft was presented for payment on April 25th, and payment refused, such collateral amounted, above the amount of the overdraft then existing, to about $7,000, and after that date the Iowa National Bank converted sufficient of such collateral to pay its then overdraft, and thereafter returned to the trustee in bankruptcy the balance of such collateral.

When the Bank of Sully drew Roedenbeck's draft against the Iowa National Bank, its cashier supposed the Iowa National Bank would pay the draft. The Bank of Sully had been issuing drafts on said Iowa National Bank, and "sent remittances there most every day," and knew and took into consideration that it had collateral with them to secure any overdraft. The said Iowa National Bank had paid checks drawn on it by the Bank of Sully, and had not dishonored checks prior to that time. The cashier of the Bank of Sully knew its account had been overdrawn when he drew the draft in question. The Iowa National Bank had been honoring the drafts of the Bank of Sully. It had, prior to that time, called the cashier of the Bank of Sully up and told him its account was overdrawn, and he at once sent $5,000 to the bank. The Iowa National Bank

did not say that they would honor overdrafts—simply asked the Bank of Sully to send up cash and collateral security.

The Bank of Sully expected that the Iowa National Bank would permit them to overdraw enough to cover the draft to Roedenbeck, with the collateral he had with them, and the cashier of the Bank of Sully also supposed it would get other money in to remit to the Iowa National Bank. There was no agreement that the Iowa National Bank was to use the collateral, and there was no promise that it would, and no obligation to pay overdrafts of the Bank of Sully. The Iowa National Bank had never had occasion to sell or call in any of the collateral of the Bank of Sully in order to pay its account. It simply held it, and returned it to the Bank of Sully as the officers of the bank remitted for it, and the expectation of the cashier of the Bank of Sully when it issued the draft to Roedenbeck, was that the Bank of Sully would get enough remittances to the Iowa National Bank to take care of this draft and make up its overdraft.

On April 17, 1914, the check of Meredith & Meredith, for $2,466, paid to the Bank of Sully by Sherman, in payment of the Roedenbeck collection, was by the Bank of Sully stamped with the following indorsement:

"Pay to the order of any bank, banker, or trust company. All prior indorsements guaranteed. April 17, 1914.
"Bank of Sully, F. G. Sherman, Cashier."

And the same was forwarded by the Bank of Sully to the Continental & Commercial National Bank, its correspondent, for deposit to its credit, and it was so received and used by said bank, and was paid by the bank upon which it was drawn. At the beginning of business on April 17th the account of the Bank of Sully showed an overdraft at the said Continental & Commercial National Bank of Chicago, of $117.74; and the overdrafts at the close of each day until it closed its doors were as follows: 17th, $131.64; 18th, $232.89; 20th, $1,426.57; 21st, $1,460.47; 22d, $369.82; 23d, $122.82; 24th, $1,436.18; 25th, $1,534.51; 27th, $1,555.92.

From a stipulated statement of the business transacted between the Bank of Sully and the Continental & Commercial National Bank of Chicago, it appears that, on the same day that the check representing the payment of the Roedenbeck note was sent to the Chicago bank, that bank sent to the Bank of Sully, for credit, cash items aggregating $2,474.26, and charged them to the account of the Bank of Sully, Iowa. It further appears that, after crediting the Bank of Sully with the check received in payment of the Roedenbeck note and another small item, and charging the Bank of Sully with the cash items sent it for collection and credit on the same day, the account of the Bank of Sully with the Chicago bank showed an overdraft of $131.64, and the account of the Bank of Sully with the Chicago bank was overdrawn upon the close of business each day thereafter until it closed, in the sums above stated. The Bank of Sully loaned no money and received no bills payable after making the Roedenbeck collection, and no other property of any kind was

acquired by the Bank of Sully from the time they made this collection for claimant until the filing of the petition in bankruptcy.

After the close of banking hours on April 27th the bank never again opened. That evening, after the close of business, John H. Sherman and H. M. Gove, both relatives of the cashier of the bank, were present and discussed the situation, that the bank was insolvent. They were both general depositors of the bank, having money to their credit, and the former drew his check for $745, the latter drew his check for $500, and both received the amount therefor; the checks being left on the spindle and never entered on the bank's books, such books having been closed and balanced for the day. The trustee is proceeding against them to recover the proceeds of these checks from Sherman and Gove respectively. At the time the bank closed on the 27th, the cash balance was $1,671.46. After the two checks above referred to were paid by the cashier, this was reduced to $426.70, and this is the amount of cash that came into the hands of the trustee belonging to said bankrupt.

October 12, 1914, Roedenbeck filed an amended reclamation petition, issue was joined, and the referee, on the 18th day of November, 1914, duly entered an order in substance: (a) Denying and dismissing the claim of the petitioners to an equitable assignment by the bankrupt of the collateral of the Bank of Sully held by the Iowa National Bank of Des Moines, Iowa. (b) Allowing the claim of the petitioner to any and all proceeds of the said petitioner's property, the same being the proceeds of the said collection, coming into the hands of the trustee; and it was further thereupon ordered by the referee that Roedenbeck's claim be allowed as a prior claim to participate with other claims of the same class against the actual cash coming into the hands of the trustee at the time the petition in bankruptcy was filed, to wit, $426.70, together with any additions thereto which may come into the hands of the trustee from the recovery of voidable preferences. It was further ordered that, when the claim of Roedenbeck and other claims of the same class have participated therein until the said fund is exhausted, then the balance of said claim shall be allowed as an unsecured claim against the estate, to participate in any and all dividends declared.

November 20, 1914, Roedenbeck filed a petition for review of such order, predicating error on the part of the referee as follows: (1) The referee erred in denying and dismissing the petitioner's claim against certain of said assets for and on account of an alleged equitable assignment thereof. (2) Said referee erred in refusing and denying the petitioner the right to recover said claim in full out of the proceeds of the collateral of said bankrupt held by the Iowa National Bank at the time petitioner's check or draft was drawn and afterwards delivered to the trustee. (3) Said referee erred in refusing and denying the petitioner the right to recover said claim in full from the proceeds of said bankrupt estate in the hands of the trustee.

Such proceedings were had that the judge of said court on December 16, 1914, filed a decision upon such review, and on the 24th day of December, 1914, a decree was duly entered, in substance, that the claim of

Roedenbeck in the sum of $2,278.72, be allowed as a prior claim against said bankrupt estate, and the trustee was thereby ordered and directed to pay Roedenbeck the full face value of said claim from the assets of said estate, and if not paid forthwith the same to draw interest at 6 per cent. per annum from the date of such order. The trustee thereupon perfected an appeal, and the same is properly here for determination.

Appellant, by proper assignments, contends that the said decree entered on the 24th day of December, 1914, requiring the payment to Roedenbeck in full of his demand, is erroneous: (1) Because the undisputed evidence affirmatively shows there was no assignment to claimant, either equitable or otherwise, of any part of the collateral security held by the Iowa National Bank upon which the draft to claimant was drawn. (2) That the fact that the bankrupt may have converted and dissipated a trust fund in its hands, belonging to claimant, does not operate to give claimant a lien upon, nor a right to priority of payment from, the general assets of the bankrupt, to the prejudice of its general creditors and the trustee herein, when it affirmatively appears that neither the trust fund nor any of the proceeds thereof is traceable to such assets and did not in any way increase the assets coming into the hands of the trustee. (3) Because the sum of $426.70 in cash is the only money or property of the assets of the bankrupt that ever came into the trustee's hands into which the trust fund claimed by Roedenbeck or any part thereof, or any of the proceeds thereof can be traced.

[1] 1. Under the facts above stated, was there an equitable assignment to Roedenbeck of any part of the collateral security held by the Iowa National Bank, upon which the draft to him was drawn?

The mere giving of a check on an ordinary deposit account in a bank, in the usual course of business, does not amount to an equitable assignment, even though the drawer makes a deposit expressly to cover the check and the garnishment of the bank after such deposit has been made and the checks given, creates a lien upon the deposit superior to the rights of the payee. Poland v. Love, 164 Fed. 186, 91 C. C. A. 466. Upon the deposit of collateral with a bank with a contract giving the bank the right to declare any indebtedness of the depositor due and payable at once, in case of insolvency, and also the right to apply thereon any money, credits, or other property of the depositor in the hands of the bank, does not create a lien on any such funds or credits, *but merely gives the bank an option* which cannot be exercised after a receiver has been appointed for the depositor in insolvency proceedings. Corn Exchange National Bank v. Locher et al., 151 Fed. 764, 81 C. C. A. 388.

The draft drawn by the Bank of Sully upon the Iowa National Bank and forwarded to the agent of Roedenbeck was the usual and ordinary way for making remittances, and even though there had been funds in the Iowa National Bank sufficient to pay the draft at the time it was drawn, the holder thereof would have no right of action against the bank in the event the account of the drawer was overdrawn before it was presented, unless the check be accepted by the bank. Code Supp. Iowa 1907, § 3060, c. 189; Fourth Street Bank (of Philadelphia) v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855; Bank of Republic v.

Millard, 10 Wall. 152, 19 L. Ed. 897; First National Bank v. Whitman, 94 U. S. 343, 24 L. Ed. 229. And it is also settled that a check drawn in the ordinary form does not, as between the maker and payee, constitute an equitable assignment pro tanto of an indebtedness owing by the bank upon which the check has been drawn. Fourth Street Bank v. Yardley, supra; Florence Mining Co. v. Brown, 124 U. S. 385, 8 Sup. Ct. 531, 31 L. Ed. 424; Laclede Bank v. Schuler, 120 U. S. 511, 7 Sup. Ct. 644, 30 L. Ed. 704.

The general doctrine of equitable assignments or liens can have no application under the facts in this case. Under this general doctrine, the Bank of Sully might have made an agreement with Roedenbeck by the terms of which a charge or claim would have been created in the nature of an assignment or lien on the collateral in the possession of the Iowa National Bank for the amount of the draft drawn, and a court of equity would have enforced such agreement. Coates v. First National Bank of Emporia, 91 N. Y. 26; Fourth Street Bank v. Yardley, supra. There is no claim here that when this draft was given there was, in addition to the draft, an agreement, either oral or written, between the Bank of Sully and Roedenbeck, by which the former assigned or agreed to assign to Roedenbeck so much of said collateral as was necessary to secure and pay the draft, and there was no agreement between the Bank of Sully and the Iowa National Bank that the Iowa National Bank would pay any overdrafts of the Bank of Sully. Therefore, upon the face of this record, it is not established, nor has it been attempted to be established, that it was the intention or agreement of the parties to the transaction that the draft drawn in payment of the Roedenbeck collection should be a lien or charge upon the collateral of said bank held by the Iowa National Bank, and we therefore conclude that there was no assignment to claimant, Roedenbeck, of any part of such collateral.

[2] 2. Does the fact that the bankrupt converted and dissipated the proceeds of this collection, belonging to Roedenbeck, operate to give Roedenbeck a lien upon or right to priority of payment from the general assets of the bankrupt, to the prejudice of its general creditors and the trustee herein?

It must be conceded that the relation of debtor and creditor never existed between Roedenbeck and the Bank of Sully. Roedenbeck was the owner of the note forwarded for collection and of the moneys collected, and it is clear that Roedenbeck could have obtained possession of the note at any time before its payment, or of the check, or of any moneys in the hands of the bank, received by the bank in payment of Roedenbeck's note. The ownership of this note and the fact that Roedenbeck was the owner of the proceeds of its collection, after the proceeds had been misapplied by the Bank of Sully, to whom it had been intrusted, did not entitle Roedenbeck to a general lien upon the assets of the trustee in bankruptcy of such bank for the value of such property. He can only follow the note, or the proceeds of the collection, so far as it can be traced in its original form, or in other forms into which it has been converted.

Where a trustee mingles trust funds and makes payments out of the common fund, there is a sufficient identification of the remainder, not

exceeding the smallest amount the fund contained subsequent to the commingling, because the legal presumption is that he regarded the law, and neither paid out nor invested in other securities or property the trust fund, but kept it sacred. Spokane County v. First National Bank of Spokane et al., 68 Fed. 979, 982, 16 C. C. A. 81; Empire State Surety Co. v. Carroll County, 194 Fed. 593, 114 C. C. A. 435; In re T. A. McIntyre Co., 185 Fed. 97, 108 C. C. A. 543; In re First State Bank, 152 Iowa, 724, 133 N. W. 355, and citations; Burgoyne v. McKillip, 182 Fed. 452, 104 C. C. A. 590; Schuyler v. Littlefield, Trustee of Brown & Co., 232 U. S. 707, 34 Sup. Ct. 466, 58 L. Ed. 806. And one for whom a bank had collected a draft before it failed is not entitled to preference over other creditors if the bank had disposed of the proceeds before the assignee came into possession. Nonotuck Silk Co. v. Flanders, 87 Wis. 237, 58 N. W. 383. And under such circumstances he is entitled to recover only the lowest balance to the credit of the collecting bank in the bank on which the check was drawn where it was deposited between the date of the deposit and the appointment of the receiver. American Can Co. v. Williams (C. C.) 176 Fed. 816; Board of Commissioners of Crawford Co., Ohio, v. Strawn, 157 Fed. 49, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100.

There is no recognized ground upon which equity can pursue the proceeds of this collection, misapplied by the bankrupt, and impose upon it the character of a trust, except on the theory that the money is still the property of Roedenbeck, and if Roedenbeck is to be permitted to follow the proceeds of the collection of the note, received by the bankrupt upon the collection of the same, and recover it, it is because the property belongs to the petitioner, whether in the form which he parted with its possession or in a substituted form. Under the earlier rule petitioner would have been required to identify it as the very property which he had confided to another. The modern and more equitable doctrine permits the recovery of a trust fund from one not an innocent purchaser, and into any shape into which it may have been transmuted, *provided he can establish the fact that it is his property, or the proceeds of his property, or that his property has gone into it and remains in a mass from which it cannot be distinguished.* Spokane County v. First National Bank, supra.

This more recent doctrine follows the rule announced in Re Hallett's Estate (Knatchbull v. Hallett) 13 Ch. Div. 696, which is to the effect that, if money held by one in a fiduciary character has been paid by him to his account at his bank, the person for whom he held the money can follow it and has a charge on the balance in the banker's hands, and that if the depositor has commingled it with his own funds in the bank, and afterwards drawn out sums upon checks in the ordinary manner, he must be held to have drawn out his own money in preference to the trust money, and that if he destroyed the trust fund by dissipating it altogether, there remains nothing to be the subject of the trust; *that only so long as the trust property can be traced and followed into other property into which it has been converted, does it remain subject to the trust.* Judge Adams, now of this court, then District Judge for the

227 F.—23

Eastern District of Missouri, after announcing the above doctrine, said:

"There is another line of authority announcing the proposition that because a trust fund, when appropriated by a trustee to his own use, swells his assets, the general estate of the trustee, when insolvency supervenes, will be impressed with a trust for the reimbursement of the cestui que trust, on the ground that such estate has been benefited to an equal amount by the trustee's breach of duty. But this rule, as I understand it, has not received the sanction of any federal court, and of but few state courts. The equity, or, rather, want of equity, of such a rule is well characterized by the Court of Appeals of New York in the case of Cavin v. Gleason, 105 N. Y. 256, 11 N. E. 504." Mercantile Trust Co. v. St. L. & S. F. Ry. Co. (C. C.) 99 Fed. 488.

The court in that case further says:

"Following the well-settled rule already stated, that the entire account with which trust funds have been commingled may be appropriated for the satisfaction of the trust, and giving the intervener the full benefit of that rule, *I am of opinion that the minimum amount found at any one time in the account of the Frisco Company must be the maximum amount of the trust fund which by any possibility can be traced into the receiver's hands.*" Mercantile Trust Co. v. St. L. & S. F. Ry. Co., supra.

We have examined the citations relied upon by claimant and find that in Nurse v. Satterlee, 81 Iowa, 491, 46 N. W. 1102, the collection was remitted by the bank to its correspondent, just as was done in the instant case, and it appears from the opinion that:

"Instead of keeping the trust fund separate and apart from other funds of the bank, it was deposited with the Council Bluffs Savings Bank, and, when the assignment was made, *there was a balance in that bank in favor of the Exchange Bank amounting to $2,000.* Under this state of facts the plaintiff is entitled to full payment."

It appears, therefore, that this money was traced and identified as a deposit in the Council Bluffs Savings Bank, and that there was an amount of cash in that bank to the credit of the insolvent bank to more than pay the claim.

In Peters v. Bain, 133 U. S. 670, at page 678, 10 Sup. Ct. 354, at page 357 (33 L. Ed. 696), it is said, in substance, that the trust resulting to the bank by reason of the wrongful or unlawful use of its funds by its officers in the purchase of property for the firm, or the several members thereof, the case divides itself into two parts: (a) Relating to property which was purchased with moneys that can be identified as belonging to the bank; and (b) to that which was bought and paid for by the firm out of the general moneys, or moneys in their possession, and which may or may not have been made up, in part, of what had been wrongfully taken from the bank.

"As to the first of these classes of property we entertain no doubt that the trust exists, and that it may be enforced by the receiver. * * * These funds were converted by them, regardless of their duty as trustees, into this *particular property, which still exists in specie.* No money was used in these purchases other than such as was taken directly from the bank for that purpose. *Under these circumstances the property stands in the place of the money used,* and it might have been reclaimed by the bank at its election any time before the rights of innocent third parties intervened. This is elementary. The receiver succeeded to the rights of the bank in this particular."

"The property in the second class, however, occupies a different position. There the purchases were made with moneys that cannot be identified as be-

longing to the bank. The payments were all, so far as now appears, from the general fund then in the possession and under the control of the firm. Some of the money of the bank may have gone into this fund, but it was not distinguishable from the rest. The mixture of the money of the bank with the money of the firm did not make the bank the owner of the whole. All the bank could in any event claim would be the right to draw out of the general mass of money, *so long as it remained money*, an amount equal to that which had been wrongfully taken from its own possession and put there. Purchases made and paid for out of the general mass cannot be claimed by the bank, *unless it is shown that its own moneys* then in the fund were appropriated for that purpose. Nothing of the kind has been attempted here, and it has not even been shown that, when the property in this class was purchased, the firm had in its possession any of the moneys of the bank that could be reclaimed in specie. To give a cestui que trust the benefit of purchases by his trustees, it must be satisfactorily shown that they were actually made with the trust funds."

In Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405, the specific fund transferred by the bankrupt to his son was admittedly in his possession, and the action was by the trustee to recover the specific fund.

In Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047, the court simply affirmed the rule of law theretofore announced in Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981, with reference to the ownership of shares of stock of the kind theretofore purchased by the bankrupt for the claimant, and paid for, found in the possession of the bankrupt at the time of the filing of the petition, and to which claim had been made by no other person, the time for making such claim having expired, and the court thereby recognized that:

"Such shares were unlike distinct articles of personal property, differing in kind or value."

The case of Holder v. Western German Bank, 136 Fed. 90, 68 C. C. A. 554, is a simple determination of the trust character of the fund realized upon a collection, and there is nowhere in the opinion a recognition of any question as to the fact that the fund remained in the hands of the bankrupt bank. On the other hand, the court does (136 Fed. at page 92, 68 C. C. A. at page 556) recognize the rule stated in National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693, where the principle announced in Knatchbull v. Hallett, 13 Ch. Div. 696, supra, is fully confirmed, as follows:

"That the bank was an agent in making the collection. When it had made the collection, it held it in trust. If it mingled it with its own funds, the trust attached pro tanto to the funds."

There is no suggestion that the trust attached to property other than the funds with which it was mixed and of which it became a part.

In Erie R. Co. v. Dial, 140 Fed. 689, 72 C. C. A. 183, the same court again considered the subject involved in Holder v. Western German Bank, supra, and determined that:

"Where the tort-feasor had mingled the property of the owner with his own, a lien would attach to the mass pro tanto."

And in 140 Fed. at page 690, 72 C. C. A. at page 185, the court says:

"We recognize that the rule only permits the following of the converted assets which can be traced as proceeds, and that the lien does not attach to assets in which neither the thing nor its value can be found."

In Empire State Surety Co. v. Carroll, 194 Fed. 593, at page 604, 114 C. C. A. 435, at page 446, the court recognizes the rule in the following language:

"It is indispensable to the maintenance by cestui que trust of a claim to preferential payment by a receiver out of the proceeds of the estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came to the hands of the receiver, and then the claim can be sustained *to that fund or property only and only to the extent that the trust property or its proceeds went into it.*"

Special attention is called to the long list of citations following this paragraph. It may be noted that these cases fully sustain the foregoing statement of the court. The principle announced in claimant's citation of McLeod v. Evans, 66 Wis. 401, 28 N. W. 173, 214, 57 Am. Rep. 287, was directly overruled by Nonotuck Silk Co. v. Flanders, 87 Wis. 237, 58 N. W. 383, and the rule therein stated has ever since been adhered to by said court.

It follows, therefore, that the fact that the bankrupt did convert and dissipate this trust fund belonging to Roedenbeck does not operate to give him a lien upon nor a right to priority of payment from the general assets of the bankrupt. Therefore the judgment of the court, directing the payment of the full amount of the claim involved from the general assets of the estate, is erroneous.

There is no pretense in the record that the claimant traced his funds into any assets, either in cash or property, in which said funds were invested, in the hands of the trustee, other than the sum of $426.70 in cash, remaining in the bank upon the date the petition in bankruptcy was filed, and which came into the hands of the receiver. It appears affirmatively that the proceeds of claimant's collection cannot be found in any of the assets in the hands of the trustee, other than the cash above mentioned.

It follows, from these conclusions, that the order of the District Court must be reversed, with directions to enter an order that the claim of the petitioner, Roedenbeck, be allowed as a prior claim, to participate with other claims of the same class, against the actual cash coming into the hands of the trustee at the time the petition in bankruptcy herein was filed, to wit, $426.70, together with any additions thereto which may come into the hands of the trustee from the recovery of voidable preferences, and that, when the claim of Roedenbeck and other claims of the same class have participated therein until the said fund is exhausted, then the balance of said claim shall be allowed as an unsecured claim against the estate, to participate in any and all dividends declared therein.