### ZENOR v. McFARLIN (two cases).

### In re B. A. LOCKWOOD GRAIN CO.

(Circuit Court of Appeals, Eighth Circuit. December 4, 1916.)

Nos. 162, 4565.

1. BANKRUPTCY ⬅➡345—CLAIMS—PREFERENCES—TRUST FUNDS.
    One who delivered grain to a warehouseman, who subsequently became bankrupt after selling the grain, is not entitled to a preference for the value of the grain, unless there is clear proof that the proceeds of the sale went into a specific fund, or into specifically identified property, which came into the hands of the trustee in bankruptcy; it not being sufficient that it went into the general assets of the bankrupt, and thereby increased his estate.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 531, 532, 534, 539, 540; Dec. Dig. ⬅➡345.]

2. BANKRUPTCY ⬅➡340—CLAIMS—PREFERENCE—EVIDENCE.
    On a claim against a trustee of a bankrupt warehouseman, evidence *held* insufficient to trace any proceeds from the sale of claimant's grain to property or funds which came into the hands of the trustee, and therefore not to entitle the claimant to a preference.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. ⬅➡340.]

Petition to Revise Order and Appeal from the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

In the matter of the B. A. Lockwood Grain Company, bankrupt. The claim of Francis Zenor against M. McFarlin as receiver and trustee in bankruptcy to a preference right to the assets of the bankrupt

---

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was denied by the District Court, and the claimant appeals and petitions for revision. Petition to revise denied, and decree affirmed.

See, also, 225 Fed. 873.

William G. Harvison, of Des Moines, Iowa (Dale & Harvison, of Des Moines, Iowa, and E. H. Addison, of Nevada, Iowa, on the brief), for appellant and petitioner.

Charles Hutchinson and Oscar Strauss, both of Des Moines, Iowa (Clark, Byers & Hutchinson, of Des Moines, Iowa, on the brief), for appellee and respondent.

Before SMITH and CARLAND, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. About August 24, 1914, in a bankruptcy proceeding against the B. A. Lockwood Grain Company, M. McFarlin was appointed receiver of its property, and subsequently, upon the adjudication of bankruptcy about September 2, 1914, he was appointed trustee for the same property. The bankrupt, the B. A. Lockwood Grain Company, prior to its bankruptcy was engaged in dealing in grain at some 15 different cities and towns in Iowa; the principal station being at Ames. It was also conducting the Shannon & Mott Mill at Des Moines. Many years ago it commenced to issue what are called "yellow slips" at all its branches except the Shannon & Mott Mill. Francis Zenor filed in the bankruptcy proceeding a petition as plaintiff and intervener, and many others filed similar petitions in the bankruptcy proceeding, and thereupon all of the parties made a stipulation that the Zenor case should be tried as a test case, and all other claims should be governed by the result in it. From the petition of Zenor it appears that the following certificate, among others, was issued to him:

"B. A. Lockwood Grain Company Grain Storage Certificate.
"Certificate No. 291.
"Ontario, Iowa, 9—16—1913.

"This certifies that we have received from Francis Zenor at Ontario, Iowa, six hundred eighty-three bushels of corn No. 4 mixed, which we agree to purchase at the price our agent is authorized to pay (see exception noted below) for grain of like grade and quality at above-named station the date this ticket is presented for payment, less storage charges as follows: 30 days free; each succeeding 15 days or fraction thereof, one-fourth cent per bushel. Express authority is given by acceptance hereof that said grain may be mingled with grain of other persons and shipped or moved to any other elevator we may select. When agent is authorized to pay above shipping value, and the grain represented by this certificate has been previously shipped away from the station, the owner of this certificate agrees to accept in payment Chicago price for grain of like grades less freight and one cent per bushel. This grain is insured to full value.                    [Signed]    M. Ross, Agent.
"This certificate must be surrendered when grain is paid for."

Certificates of like character were issued by the bankrupt to Mr. Zenor: Certificate No. 294, September 18, 1913, for 650 bushels of corn, No. 3, mixed; certificate No. 295, September 23, 1913, for 766⁶⁰/₇₀ bushels of corn, No. 4, mixed; certificate No. 296, September

27, 1913, for 696$^{60}$/$_{70}$ bushels of corn, No. 4, mixed; certificate No.. 1961, August 10, 1914, for 1,256$^{18}$/$_{32}$ bushels of oats, No. 3W.

The petition in the Zenor case contains the following allegations:

"Par. 8. That thereafter, and prior to September 2, 1914, the date of adjudication of bankruptcy herein, the said Grain Company, in disregard of the duties devolving upon it as expressed in said certificates Nos. 291, 294, 295, 296, and 1961 aforesaid, unlawfully and wrongfully appropriated said grain to its own use, by unlawfully and wrongfully removing said grain from the elevator wherein it was stored and selling the same upon the general market without the knowledge or consent of plaintiff. That upon making such sale of said grain, said Grain Company received the value thereof from the parties to whom sold, and placed the same in the treasury of said Grain Company. That by reason of the premise the apparent assets of said Grain Company were unlawfully and wrongfully increased and enlarged to the extent of said sum of two thousand four hundred and twenty-nine dollars ($2,429.00).

"Par. 9. That upon the delivery of said grain by plaintiff to said Grain Company the same was held by it as the bailee or trustee of plaintiff, and the proceeds of said grain, when so unlawfully and wrongfully received by said Grain Company, as hereinbefore stated, were impressed with a lien or trust thereon to the full amount thereof, in favor of plaintiff, and were in truth and in fact money belonging to plaintiff, then by the said unlawful and wrongful sale of said grain coming unlawfully and wrongfully into the hands of said Grain Company, and were held by it as bailee or trustee for plaintiff.

"Par. 10. That upon the adjudication in bankruptcy said proceeds of said grain, though in form passing by said adjudication to said M. McFarland, as receiver and the trustee in bankruptcy of said Grain Company, were received by said trustee impressed with a lien or trust thereon to the full extent thereof in favor of plaintiff; and said proceeds so received by the trustee in bankruptcy are really held by said trustee in bankruptcy as bailee or trustee for plaintiff, though in form held as trustee for the bankrupt and its general creditors.

"Par. 11. That said grain, at the date of said unlawful and wrongful appropriation thereof, and on August 24, 1914, the date of the filing of the petition in bankruptcy herein, and on September 2, 1914, the date of adjudication herein, was of the value of two thousand four hundred and twenty-nine dollars. ($2,429.00)."

The trustee filed an answer which contained the following:

"Third. That even if the said certificates or yellow slips or agreements, oral or in writing, did constitute the bankrupt a bailee for hire or trustee of the property so delivered, yet the bankrupt had, prior to the filing of petition in bankruptcy, sold all of said grain so delivered to it by the various claimants, and had used the proceeds thereof in the payment of its obligations in the conduct of its business, and upon the 24th day of August, 1914, when the petition in bankruptcy against said bankrupt was filed, there was not in the hands of the said bankrupt any of the proceeds of the said sales, and the estate of said bankrupt which came into the hands of this trustee, or of the receiver of the B. A. Lockwood Grain Company was not in any manner increased or enhanced by the proceeds of the sale of said grain, but all of the proceeds of the sale of said grain had been paid out by the bankrupt in the usual course of business before the petition in bankruptcy was filed, viz., August 24, 1914."

[1] Zenor claimed that the certificates in question evidenced a kind of bailment, and that by selling the grain the Grain Company became a trustee ex maleficio of the funds received for it. The case was tried before the referee, who held that the certificates constituted contracts of sale of the grain at a price to be fixed by the designation of the time by Zenor, and dismissed the petition for preference, but allowed the claim of Zenor as a general creditor against the bankrupt estate..

Upon review in the District Court, it, in commenting on the controversy as to whether the certificates constituted contracts of bailment or sale, said:

"I do not think that it is necessary to decide this question under the facts presented to the court. It clearly is not an ordinary case of bailment, nor is it an ordinary sale. Without going into the matter in detail, I feel that it is a conditional sale. * * * But whether sale or a bailment, it is apparent from the evidence that the grain was sold by the company, and even if it were a bailment this sale constituted a conversion, and for this conversion a cause of action arose against the company. * * * The evidence showed that it was sold in the ordinary course of business and that the receipts therefor went into the ordinary business of the company. * * * A claim is made now that for this debt, based upon conversion of this grain, the claimant is entitled to preference. I do not know of any authorities sustaining the proposition; if it affirmatively appeared that the specific money received from property converted remained on hand, so that it could be identified, then the court would be justified in a case of conversion in holding that the claimant would be entitled to such money; but there is no proof here that any of the assets on hand was the direct proceeds of any of the grain sold."

The District Court thereupon affirmed the action of the referee. Being in doubt as to whether his remedy was by appeal to this court or by petition to revise the action of the District Court, Mr. Zenor has pursued both courses.

In Century Savings Bank v. Robert Moody & Son, 209 Fed. 775, 126 C. C. A. 499, we held that these two remedies were mutually exclusive, and consequently either the appeal or the petition to revise should be dismissed; but, in view of the conclusion we have reached, it becomes unnecessary to determine as to which of them this order should be made without a consideration of the merits, nor do we find it necessary to pass upon the question as to whether the certificates constituted contracts of bailment, of sale, or of conditional sale. The earlier authorities held that a claimant such as the plaintiff must identify the property sought to be recovered as the very property he had confided to another. Later some of the states announced that when a trustee appropriated to his own use the property of the trust he thereby swelled his assets, and when he became insolvent his general estate became impressed with the trust for the reimbursement of the beneficiary. The later doctrine has never been approved in its fullness by the federal courts.

In Empire State Surety Co. v. Carroll County, 194 Fed. 593, 114 C. C. A. 435, this court, presided over by Circuit Judges Sanborn, Hook, and Adams, delivered, through Circuit Judge Sanborn, the unanimous opinion of this court on the subject. The opinion in that case is remarkable for its display of erudition, and in it appears the following:

"(1) It is indispensable to the maintenance by a cestui que trust of a claim to preferential payment by a receiver out of the proceeds of the estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came to the hands of the receiver, and then the claim can be sustained to that fund or property only and only to the extent that the trust property or its proceeds went into it. It is not sufficient to prove that the trust property or its proceeds went into the general assets of the insolvent estate and increased the

amount and the value thereof which came to the hands of the receiver.  *  *  *

"(2) Proof that a trustee mingled trust funds with his own and made payments out of the common fund is a sufficient identification of the remainder of that fund coming to the hands of the receiver, not exceeding the smallest amount the fund contained subsequent to the commingling,  *  *  *  as trust property, because the legal presumption is that he regarded the law and neither paid out nor invested in other property the trust fund, but kept it sacred.  *  *  *

"(3) For the same reason the legal presumption is that promissory notes, bonds, and other property coming to the hands of the receiver were not procured by the use of, and are not, trust property.  *  *  *

"(4) Where a trustee has mingled in a common fund the moneys of many separate cestuis que trustent and then made payments out of this common fund, the legal presumption is that the moneys were paid out in the order in which they were paid in, and the cestuis que trustent are equitably entitled to any allowable preference in the inverse order of the times of their respective payments into the fund."

The question was again recently before this court in Macy v. Roedenbeck, 227 Fed. 346, 142 C. C. A. 42, L. R. A. 1916C, 12. In that case this court said:

"Under the earlier rule petitioner would have been required to identify it as the very property which he had confided to another. The modern and more equitable doctrine permits the recovery of a trust fund from one not an innocent purchaser, and into any shape into which it may have been transmuted, *provided he can establish the fact that it is his property, or the proceeds of his property, or that his property has gone into it and remains in a mass from which it cannot be distinguished.*"

Later in the same opinion it is said:

"*Only so long as the trust property can be traced and followed into other property into which it has been converted does it remain subject to the trust.*"

In Spokane County v. First National Bank, 68 Fed. 979, 16 C. C. A. 81, the Circuit Court of Appeals of the Ninth Circuit said, with Mr. Justice McKenna of the Supreme Court of the United States sitting:

"We are unable to assent to the proposition that, because a trust fund has been used by the insolvent in the course of his business, the general creditors of the estate are by that amount benefited, and that therefore equitable considerations require that the owner of the trust fund be paid out of the estate to their postponement or exclusion. If the trust fund has been dissipated in the transaction of the business before insolvency, it will be impossible to demonstrate that the estate has been thereby increased or better prepared to meet the demands of creditors, and even if it is proven that the trust fund has been but recently disbursed, and has been used to pay debts that otherwise would be claims against the estate, there would be manifest inequity in requiring that the money so paid out should be refunded out of the assets, for in so doing the general creditors whose demands remain unpaid are in effect contributing to the payment of the creditors whose demands have been extinguished by the trust fund. Both the settled principles of equity and the weight of authority sustain the view that the plaintiff's right to establish his trust and recover his fund must depend upon his ability to prove that his property is in its original or a substituted form in the hands of the defendant."

See Central Trust Co. v. Chicago, A. & N. Ry. Co. (D. C.) 232 Fed. 936, 943.

The question of when a beneficiary can follow a trust fund is so fully settled in the federal courts generally, and in this court in partic-

ular, that it is not worth while to analyze the various state court decisions that have gone further.

[2] Now, assuming the law to be as repeatedly laid down by this court, what basis is there for giving Zenor a preference? The evidence is quite meager upon some points. For aught that appears all the plants of the company were acquired and paid for before any of these certificates were ever issued, and no preference can then be allowed as against any of the plants. There is no evidence as to how much the Grain Company owed at the time of its failure, much less at any other time. There is nothing even tending to show what the expenses were of conducting this business at the 16 places where it was carried on. When the company was doing business, it bought outright about two-thirds of the grain delivered to it at its various stations, and issued certificates, substantially such as those here in question, upon the balance; but at the time of the failure, as shown by the inventory, it owed $97,498.48 for grain, of which about $60,000 was represented by these storage certificates. The plaintiff Zenor's claim, and the claims of others filed for a preference as heretofore referred to, aggregate nearly $20,300. There is no proof as to when the plaintiff's grain was converted, except that it was all converted before the commencement of the bankruptcy proceeding, August 24, 1914. All the grain delivered by the plaintiff to the Grain Company, except that covered by the certificate No. 1961, was delivered nearly a year before the failure. The record is wholly lacking in any testimony as to what the usual amount of business done by the company in a year was in dollars and cents. Mr Lee Lockwood, an officer of the defunct company, testified:

"Q. Now what was done from time to time with the money which the B. A. Lockwood Grain Company received from the grain you sold and for which you had issued these yellow slip certificates? A. That money always came—practically always came—in the form of drafts and was deposited in the banks. Q. And what resulted with it? A. Checked out in the ordinary course of business."

That is the only testimony on that subject. "In the ordinary course of business" would include operating expenses, payment of the amount due on yellow slips, payment of debts of the Grain Company, and purchase of grain and other merchandise. There is nothing showing the condition of the bank account from day to day, and, as already indicated, no evidence when the plaintiff's grain was sold, except that it was sold promptly. We cannot say from the evidence that the bank account was not frequently all drawn out during the nearly a year that elapsed after the body of this grain was delivered and before the failure, and we cannot, therefore, find that the proceeds of the plaintiff's grain were on hand at the date of the bankruptcy. A more difficult question arises as to the oats deposited under certificate No. 1961. They were deposited but two weeks before the failure. At the time of the failure there was charged to various consignees "grain in transit," $106,169.71. This grain had been shipped in the 30 days next preceding the failure, and probably included the plaintiff's oats; but the record does not show that the company ever had on hand at any

one time all this grain. When a car would be shipped, the Grain Company would draw on the consignee for the estimated value of the grain shipped, sometimes for a little more than its value, but usually slightly less, and deposit the draft in their bank, and take credit for it. Thus the capital invested in the grain in transit was constantly turned over. This would make an average daily shipment of over $3,500, and by the system used, if it were proper to assume that the grain was uniformly shipped, the total capital necessary to carry on this business was a little over $3,500. Mr. Lockwood testified as to this fund as follows:

"Q. What, if anything, was done with the money that you received on this $106,000 of sight drafts practically for grain in transit? · A. It was used in the ordinary course of business. The major portion of it was used in the purchase of new property that came into the hands of the receiver. We were buying grain, buying coal, and buying feed, and when I say property, I mean grain, coal, and feed. That money was not used to any extent in the payment of debts, though current expenses were paid from it."

Assuming the truth of this, and it is uncontradicted, how much was spent for grain or other merchandise, and of this sum what was paid on yellow slips or how much for current expenses? We do not know, and, if we guess at that, how much of the grain in which it was invested in turn shipped and included in the $106,169.71? Again we do not know. There is nothing to show the dates the other claimants left their grain with the Grain Company, and nothing to show when the holders of the $40,000 worth of yellow slips who have not filed claims for a preference deposited their grain. There was finally paid to the receiver or trustee, upon all of the grain in transit, the sum of about $2,000, being the balance after charging the Grain Company with the drafts it had drawn on the consignees. The only possible doubt is as to whether the plaintiff is entitled to a preference as to this $2,000; but in view of the doubt as to whether plaintiff's oats were embraced in these shipments, and the doubt as to which of the holders of certificates of storage, called "yellow slips," had grain embraced in the shipments, we cannot say, in the language of the Empire State Surety Co. v. Carroll County, supra, that there is "clear proof" that any of the plaintiff's property went into said fund of $2,000.

The case of Duel v. Hollins, 241 U. S. 523, 36 Sup. Ct. 615, 60 L. Ed. 1143, does not, in our judgment, conflict with this holding.

It is therefore ordered that the petition to revise be denied and dismissed, and the decree below be affirmed.