CONKLING v. NEW YORK LIFE INS. & TRUST CO. et al.

(Court of Appeals of District of Columbia. Submitted October 8, 1919.
Decided December 1, 1919.)

No. 3230.

**1. EQUITY ⟨⟩81—LACHES NO BAR WHERE UNSUCCESSFUL NEGOTIATIONS INTER-
VENED.**

A bill to impress a trust on property improved by plaintiff's mother
with plaintiff's funds was seasonably brought some three years after the
mother's death, where the intervening period had been occupied with un-
successful negotiations for a settlement and filing a claim against the
mother's estate in New York State.

**2. EVIDENCE ⟨⟩186(2)—TESTIMONY AS TO LOST LETTERS ADMISSIBLE.**

In suit to impress a trust on property which plaintiff's deceased mother
had improved with plaintiff's money, a witness may testify concerning lost
letters from the mother to plaintiff, which the witness had read, and
from which he had made extracts.

**3. TRUSTS ⟨⟩81(4)—RESULTING FROM INVESTMENT BY MOTHER OF SON'S MONEY
IN LAND.**

Evidence that plaintiff's mother had removed his bonds from a safe de-
posit box to which they had joint access to another box used by her alone,
and that the proceeds were used in remodeling real estate which she
apparently had expected to deed to her son, etc., *held* to establish plain-
tiff's right to have a trust declared on the improved real estate to the ex-
tent that the proceeds of his bonds went into the property. ·

Smyth, Chief Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Suit by David Paul Burleigh Conkling, against the New York Life
Insurance & Trust Company, executor and trustee under the will of
Sarah B. Conkling, deceased, Delia Mason Caldwell, Sarah B. C. Mol-
ler, and others. From a decree dismissing the bill, plaintiff appeals.
Reversed and remanded.

Wm. G. Johnson, of Washington, D. C., for appellant.

B. S. Minor and L. Randolph Mason, both of Washington, D. C.
(Hugh B. Rowland and Colley W. Bell, both of Washington, D. C., of
counsel), for appellees.

ROBB, Associate Justice. Appeal from a decree in the Supreme
Court of the District dismissing appellant's bill for discovery, the dec-
laration of a resulting trust, and the conveyance to appellant of the
trust estate, and for general relief.

Mrs. Sarah B. Conkling, the mother of appellant and a resident of
the city of New York, died February 22, 1904, leaving a will under
which the appellee New York Life Insurance and Trust Company was
named executor and trustee. Appellant and the other appellees are the
beneficiaries of the trust estate created by the will. Appellant is
a sculptor, and the youngest of three children, having been born in
1871. In 1885 he was given five bonds, of the aggregate value of
$50,000. Shortly after his graduation from college, and when he was
23 years of age, appellant went abroad, and continued to reside abroad
for more than 10 years.

From May 8, 1900, to February 21, 1904, a safe deposit box was rented by appellant and his mother at the Fifth Avenue Bank in New York, either to have access thereto. On several occasions the mother was seen at the vault of that bank, and this was the only box she had there; but she did have a safe deposit box in the Lincoln Trust & Safe Deposit Company in New York, to which appellant did not have access. Upon an occasion when appellant was in this country, about 2 years prior to his mother's death, he went to his deposit box, above mentioned, and there then were in that box nine Union Pacific, six Chesapeake & Ohio, and three Richmond & Danville bonds. After the mother's death no bonds were found in the deposit box at the Fifth Avenue Bank, but in the mother's box at the Lincoln Trust & Safe Deposit Company were found Richmond & Danville, Union Pacific, and Chesapeake & Ohio bonds, together with a slip of paper on which was written, in appellant's handwriting, the following:

"3 bonds Richmond & Danville 6%.
"9 bonds Union Pacific 4%.
"6 bonds Ches. & Ohio 4%.

"D. B. P. C."

—and underneath were the words, in the mother's handwriting, "Cut coupons, S. B. C."—the letters "S. B. C." being the initials of the mother's name.

There had been some correspondence between appellant and his mother with reference to the remodeling of two small houses belonging to the mother and located on New Hampshire avenue, N. W., in the District of Columbia. Not long after the death of the mother, appellant exhibited to John M. Dickinson, Esq., of New York, who was an intimate friend of the family, some letters from his mother. Mr. Dickinson, who was very familiar with the mother's handwriting, read the letters for the purpose of formulating an affidavit for appellant, to be used in New York in prosecuting there appellant's claim to the 18 bonds heretofore mentioned. Mr. Dickinson "took extracts from the letters at that time and copied them in his own handwriting." The originals then were handed to appellant and subsequently lost. Mr. Dickinson testified that the first extract read as follows:

"I was not offended, as you thought, from your inquiry about the Washington house, but only felt that you should trust your mother. The house and land will be worth more than $20,000, if you ever wanted to sell, as Washington property is always going up. I have spoken to Octave (a sister) and perhaps to Lizzie about our plans, but I do not want the matter discussed. The less said the sooner mended. I will send you 4% interest, so that you will not lose anything there."

The second extract reads:

"Do try to practice economy. Two thousand more and the twenty will be completed."

The third extract is as follows:

"I have been thinking over our talk about your bonds. I think it would be very foolish for you to have them in Paris, and it will not be long now before the house is finished and in your name anyway. They are as safe at the Lincoln as in your box, and much more convenient for me. If you insist, I will send them; but please do what I say."

The remodeling of the house was going on when these letters were received, and was completed about the time of the mother's death, at a cost of about $20,000.

Mr. Benjamin R. Bechtel, an artist living in London, deposed that he was intimately acquainted with appellant, having lived in the same studio building with him for several years. Deponent had known appellant's mother for 6 or 7 years prior to her death. In May or June of 1902 he met her on the landing stage at Liverpool, as she was disembarking from the steamship Oceanic, and accompanied her to Calais. She referred to the house which she owned in Washington, D. C., and said she intended remodeling it, and was in hopes that her son Paul, the appellant, would occupy the house when he returned to live in America; that Paul had handed over to her $20,000 in bonds, "which she was going to use in the proposed improvements and alterations of the house, and she considered it was a better investment for him than the way in which the money was placed at the time." This statement was made voluntarily, and not in response to any inquiry by deponent.

Appellant in his testimony stated that after the death of his mother he found in his deposit box at the Fifth Avenue Bank a 12-page letter in the handwriting of his mother, on the envelope of which, also in her handwriting, were the words, "To my son Paul, to be opened after my death." Fearing that he might lose this letter, he made a careful copy of it, which he took to Europe and showed to his sisters. The original he placed in the envelope containing the other letters of his mother, and this letter with its contents subsequently was lost. The copy which he showed his sisters was attached to their deposition in this case. Over objection, the copy was read in evidence. In the letter, after discussing her children, their prospects, and the provision she had made for them, the mother wrote:

"You have the Washington house and your income from the trust [created by her will] and with your own efforts should be able to live nicely. The paper about the house is in my desk, but if you want it done more legally I will see to it with you when we meet again. Anyway, it is sure to be all right."

The sisters, who first examined the desk above referred to, admitted having destroyed certain of its contents. At the time of their testimony they were quite certain that nothing was destroyed, other than some letters from them to their mother. Mr. Dickinson, however, who talked with one of them not long after the occurrence, testified that they were not then clear as to just what had been destroyed by them. At all events, the paper was not found among the mother's effects.

[1] Immediately upon the death of his mother, appellant returned to this country, and, failing to find his bonds or the paper referred to in his mother's letter, proceeded to take steps looking to the adjustment of the matter. He first filed a claim against the estate of his mother in New York, for the return of the bonds or their value. This claim he subsequently withdrew, because he was advised that under the laws of the state of New York he could neither testify concerning the matter nor introduce in his behalf the letters he had received from his mother. Negotiations were had with his sisters,

but, no settlement resulting, this bill was filed in November of 1907. That it was seasonably filed there can be no doubt. In Southern Pac. Co. v. Bogert et al., 250 U. S. 483, 39 Sup. Ct. 533, 63 L. Ed. 1099, decided by the Supreme Court on June 9, 1919, more than 22 years had elapsed "since the wrong complained of was committed." The court said:

"It is essential that there be also acquiescence in the alleged wrong or lack of diligence in seeking a remedy. Here plaintiffs, or others representing them, protested as soon as the terms of the reorganization agreements were announced; and ever since they have with rare pertinacity and undaunted by failure persisted in the diligent pursuit of a remedy as the schedule of the earlier litigation referred to in the margin demonstrates. * * * Nor does failure, long continued, to discover the appropriate remedy, though well known, establish laches, where there has been due diligence, and, as the lower courts have here found, the defendant was not prejudiced by the delay."

In the present case, appellant immediately asserted his rights and consistently and persistently sought their recognition.

Appellant in his deposition, which was received in evidence by the court, had testified in considerable detail as to conversations that had taken place between his mother and himself concerning the remodeling of the house in question, and it was conceded by his counsel at the hearing below that much of this testimony was inadmissible under the statute of frauds. It is contended, however, that when such a deposition is offered it is within the power of the court to receive it with the same effect as though the party had been called to testify by the court, as provided in section 1064 of the Code. This question was before us in Ockstadt v. Bowles, 34 App. D. C. 58, but was not determined. Nor do we deem its determination necessary here, owing to the view we take of the case, although appellant's deposition was regularly taken and he was fully and carefully cross-examined by counsel for appellees; in other words, the result was exactly the same as though he had been called to testify by the court.

[2] It was not error for the court to permit Mr. Dickinson to testify concerning the letters from Mrs. Conkling to appellant, which witness had read, and from which he had made extracts. He was familiar with the handwriting of Mrs. Conkling, and it is apparent from the testimony that the extracts are not garbled. Indeed, they speak for themselves. But, as we do not determine the power of the trial court to consider all of appellant's deposition, we must eliminate from consideration here the letter which he found in his deposit box after his mother's death, for the contents of that letter are established by no other testimony. In so ruling, however, we do not wish to be understood as casting any reflection upon the appellant, for the copy of the letter produced by him bears indubitable evidence of authenticity.

[3] The evidence before us, then, amounts to this: Appellant unquestionably had 18 bonds in a safe deposit box in the Fifth Avenue Bank, to which his mother had access. It is apparent from her letters to him that she cut the coupons from those bonds from time to time and sent him the interest. It is further apparent, from the mother's letters and from the unimpeached testimony of Mr. Bechtel, that as the result of an understanding with her son she transferred those bonds

from appellant's deposit box to her own deposit box in another bank, and, in effect, subsequently converted them by investing the amount of their value in the remodeling of the house in question. Just what the arrangement was is difficult to determine, but it is certain that neither of the parties understood the transaction as a gift to the mother. That the mother understood she was investing the proceeds of these bonds for her son, and expected to account to him therefor, is too plain to admit of question. It is quite probable that the mother intended and the son understood that, after the repairs on the house were completed with his money, the house would be deeded to him; but, this not having been accomplished before the mother's death, we think that under the evidence equity will be met by giving appellant the relief he first sought, namely, by following this fund into the property and impressing thereon a trust in his favor. He therefore will receive back the value of his bonds, with interest from the date of the final payment on the house.

The decree is reversed, with costs, and the cause remanded, with directions to enter a decree in conformity with this opinion.

Reversed and remanded.

SMYTH, Chief Justice (dissenting). The theory of the majority is that the mother, pursuant to an agreement, "difficult to determine," invested the proceeds of certain bonds belonging to the son in the remodeling of the house in question, and that she expected to account to him therefor; and on this theory a trust is impressed upon the house in favor of the son. I might say at the outset that this is utterly out of harmony with the son's testimony, for he does not claim anywhere that the bonds belonging to him were converted into cash by the mother and the proceeds invested in the house. On the contrary, he says they were found in his mother's safe deposit box after her death.

Some space is given to a letter written by the mother to the son, and which was found in her safe deposit box after her death; but, as it is held that this letter is incompetent under the Code (section 1064), I put it aside as of no consequence.

When the son, at the age of 23, left college in 1885, his parents gave him $50,000 in government bonds. According to the records of the United States Treasury, these bonds were held by the son until April, 1900, at which time they were assigned by him in person, and were afterwards received at the Treasury Department in Washington, "some for transfer and some for redemption for account of various persons." Subsequent to this he acquired, he said, nine Union Pacific, six Chesapeake & Ohio, and three Richmond & Danville Bonds, but the "larger share of my [his] holdings was in Reading" bonds. He was unable to give the number of the bonds, or any other description which would distinguish them from other bonds issued by the same companies. When he last saw them before his mother's death, they were, he said, in his safe deposit box. He later contradicts this, as we shall see in a moment, by saying that they were in his mother's box before her death; that is, at the time he wrote the memorandum referred to by my Associates. When he next saw the box, which was a month after

his mother's death, they "were not all there." The missing bonds were the Union Pacific, Chesapeake & Ohio, and the Richmond & Danville. He saw Union Pacific, Chesapeake & Ohio, and Richmond & Danville bonds in his mother's box, but whether she then owned bonds of that description, which she had not derived from him, he could not tell. Over objection, he testified that the memorandum just mentioned, in which the Richmond & Danville, Union Pacific, and Chesapeake & Ohio bonds are noted, was "partially in my handwriting and partially in my mother's"; that the words "cut coupons" and letters "S. B. C." were in her handwriting, and all the rest was in his, and added:

"I went to the Lincoln Safe Deposit Company with my mother one day and helping her with some papers there, and I told her that I thought these bonds which she had of mine on account of this house ought to be kept separately from the rest, and I wrote that memorandum and stuck it in an elastic. Those bonds were together—I mean, separate from the rest of the bonds and papers and various accounts that she had in her box."

He thus testified to a transaction between him and the deceased, and this, of course, was incompetent.

Nor is it shown by proper testimony that he found the memorandum among his mother's papers. With respect to that he said at the trial that the appellee trust company "had taken possession of all her papers and the contents of the box," and that he asked them "if they would look through the papers and see if there was anything among them which referred in any way to me" [him]; that they went through them, found the memorandum, and delivered it to him. But whether it was located in what had been the "contents of the box" or among the other papers he does not say. True, he averred in an ex parte affidavit, which was put in evidence over the defendant's objection, that he found the memorandum in his mother's box; but such testimony was inadmissible, and, besides, was in conflict with what he said at the trial, as we have just shown. The memorandum, then, must be disregarded, for the reason that it was not properly authenticated.

We now come to consider the extracts taken by Dickinson from letters written by the mother to the son. The dates of these letters are not given by him; so we do not know when they were written. The extracts are copied in the majority opinion, and need not be set out here in extenso. A summary will suffice. In one letter the mother wrote that she was not offended, as he thought, by his inquiry about the Washington house, but only felt that he should trust her, and then observed that "the house will be worth more than $20,000, if you [he] ever wanted to sell, as Washington property is always going up," and concluded by saying, "I will send you 4% interest, so that you will not lose anything there." In the second extract she admonishes him to practice economy, and said that $2,000 more, and the $20,000 would be completed. In the third and last extract she says that she had been thinking over their talk about the bonds; that in her judgment it would be very foolish to have them sent to Paris; that "it will not be long now before the house is finished and in your name, anyway"; and concludes thus:

262 F.—40

"They [meaning the bonds] are as safe at the Lincoln as in your box, and much more convenient for me. If you insist, I will send them; but please do what I say."

There is nothing in these extracts, I submit, which warrants the conclusion that the mother had converted bonds of the son into cash and had invested the proceeds in the house. Further comment could not make this plainer.

With respect to Bechtel's testimony, he said on cross-examination that the statement made to him by Mrs. Conkling concerning the house in Washington was that—

"The amount of payment made on account of the house was $20,000, and the character of the payment was United States government bonds, and the payment was made in 1901 or 1902; I do not know which."

This is clearly a mistake. She could not have made such a statement, because at that time her son did not have any government bonds to give her, and the record clearly demonstrates that he never gave her any government bonds for that purpose or any other. The Treasury's statement, referred to above, shows that the government bonds held by him were disposed of in 1900. Besides, the son does not say that he gave his mother any government bonds, or that he ever advanced her any money. His contention is, as we have heretofore observed, that she took his railroad bonds, which were found in her box after her death. In view of this, Bechtel's testimony must be rejected as unreliable.

This leaves the theory adopted by the majority as entirely without support in the evidence. Especially is this true when we consider that, in a case like the one before us, where the contract relied upon rests partly in parol and partly in disconnected excerpts from letters written by the deceased, the proof "must be clear, definite and conclusive. * * *" Purcell v. Miner, 4 Wall. 513, 517, 18 L. Ed. 435. See, also, Barbour v. Barbour, 51 N. J. Eq. 271, 29 Atl. 148; Schuey v. Schaeffer, 130 Pa. 16, 18 Atl. 544; Krauth v. Thiele, 45 N. J. Eq. 407, 18 Atl. 351.

In addition, on the theory of the son, as expressed in his bill and testimony, the mother was the legal and equitable owner of the bonds. He claims that in pursuance of his agreement with her she took the bonds to reimburse herself for money previously expended upon the house, and that she, in turn, was to convey the house to him, but failed to do so—in other words, breached her contract to convey. In these circumstances she was in no sense a trustee of the bonds for him. She owned them absolutely. On what principle, then, can it be held that equity has the power to impress a lien on the house. It is familiar law that, before this can be done, two things must concur: (a) That she was a trustee of the bonds; and (b) that in some way they or their proceeds were invested in the house. In Macy v. Roedenbeck, 227 Fed. 346, 353, 142 C. C. A. 42, 49 (L. R. A. 1916C, 12), it was said:

"That only so long as the trust property can be traced and followed into other property into which it has been converted does it remain subject to the trust."

See Illinois Trust & Savings Bank v. First National Bank (C. C.) 15 Fed. 858; Spokane County v. First National Bank of Spokane

et al., 68 Fed. 979, 16 C. C. A. 81; Zenor v. McFarlin, 238 Fed. 721, 151 C. C. A. 571; In re See, 209 Fed. 172, 126 C. C. A. 120; City of Lincoln v. Morrison, 64 Neb. 822, 90 N. W. 905, 57 L. R. A. 885; Bradley v. Chesebrough, 111 Iowa, 126, 82 N. W. 472; Hopkins et al. v. Burr et al., 24 Colo. 502, 52 Pac. 670, 65 Am. St. Rep. 238; Reeves v. Pierce, 64 Kan. 502, 67 Pac. 1108.

This is the general rule, to which I find no exception. He neither established a trust in the bonds nor traced them into the property, but demonstrated the contrary by his own testimony. He may have a claim at law against the estate for the value of the bonds, but he has no standing in a court of equity.

For these reasons, I think the decree of the lower court should be affirmed, and hence I dissent.