### MURPHY et al. v. PAINE et al.

### PAINE v. ADAMS et al.

(District Court, S. D. New York. September 20, 1926.)

**1. Shipping ⟨⎯⟩56.**

There being no privity until after accrual of alleged cause of action on subcharter, no contractual liability exists as between shipowner and subcharterer.

**2. Shipping ⟨⎯⟩46.**

Specific provision of time charter forbidding voyage to certain ports is conclusive, and not controlled by general provision therein forbidding voyage to such ports out of season.

**3. Shipping ⟨⎯⟩56.**

Subcharterer has no greater title or control over ship than original charterer.

**4. Shipping ⟨⎯⟩46—Owner held not estopped from prohibiting voyage forbidden by charter, because of acceptance of payments on charter hire from subcharterer.**

Owner *held* not estopped from prohibiting voyage forbidden by charter, or to have waived such condition by accepting payment on the charter hire from subcharterer before such voyage was forbidden, since subcharterer is charged with knowledge of limitation in original charter.

**5. Estoppel ⟨⎯⟩52.**

Estoppel is available for protection only, and cannot be used for weapon of assault.

**6. Estoppel ⟨⎯⟩54.**

Where conditions are known to parties, or both have same means of ascertaining truth, and where they are under duty to ascertain truth, there can be no estoppel.

In Admiralty. Separate libels by Edward M. P. Murphy and others, as trustees of the Gaston, Williams & Wigmore Steamship Corporation, against William E. Paine, doing business as the Major Steam Navigation Corporation, and Charles F. Adams and others, as trustees of the New England Fuel & Transportation Company, and by William E. Paine against Charles F. Adams and others, as trustees of the New England Fuel & Transportation Company. Libels dismissed.

Foley & Martin, of New York City (Lawrence N. Martin, of New York City, of counsel), for libelants.

George V. A. McCloskey, of New York City, for respondent-libelant Paine.

Alexander & Green, of New York City (Roscoe H. Hupper, Clifton P. Williamson, and William J. Dean, all of New York City, of counsel), for respondent New England Fuel & Transportation Co.

WINSLOW, District Judge. These suits in admiralty involve a time charter for 12 months of the steamship Melrose, dated May 2, 1919, between the New England Fuel & Transportation Company and American Products Sales Corporation from which through a series of assignments, the respondent-libelant, Paine, as assignee, acquired such time charter. Thereafter a subcharter, or trip charter, dated May 14, 1919, was given by Paine to Gaston, Williams & Wigmore Steamship Corporation.

Gaston, Williams & Wigmore, under their trip charter, loaded a cargo for Archangel, in the Arctic Ocean. It is contended that the original charter prohibited such voyage. The trip charter apparently did not prohibit a voyage to Archangel. The owner (New England Fuel & Transportation Company) forbade the master to go to Archangel, and the cargo was unloaded and dispatched on another vessel.

The question involved in this suit is whether either Paine, the time charterer, or the New England Fuel & Transportation Company, can be held liable to Gaston, Williams & Wigmore Steamship Corporation for failure of the ship to clear for Archangel, and whether the New England Fuel & Transportation Company, owner, can be held liable to Paine (owner of time charter) by reason of the steamship Melrose not being permitted to make the voyage to Archangel, as demanded by Gaston, Williams & Wigmore, the subcharterer.

For convenience, the New England Fuel & Transportation Company will be referred to as the shipowner; Paine, assignee of the time charter, will be referred to as the time charterer, or Paine, and Gaston, Williams

& Wigmore Steamship Corporation will be referred to as the subcharterer from Paine, or Gaston.

In the first libel, the subcharterer (Gaston) sets forth the subcharter of May 14, 1919, whereby there was chartered "the whole of said vessel [certain space excepted] * * * for a voyage from New York to Archangel. * * *" The basis of the subcharterer's claim against the shipowner is on the theory that the shipowner, by accepting payments with knowledge of the contemplated Archangel voyage, was estopped from preventing said voyage, even though such voyage were actually prohibited by the original charter.

[1] It is contended, however, that the original charter did not prohibit the Archangel voyage. There was no privity between the shipowner and the subcharterer until after the alleged cause of action accrued. Therefore no contractual liability existed between the shipowner and the subcharterer.

The fifteenth article of the libel alleges that the shipowner had "estopped itself from setting up or acting upon any claim or right to prevent said voyage or withdraw the ship therefrom, and waived the provisions, if any, of the original charter party from said New England Fuel & Transportation Company to the assignors of the respondent, William E. Paine, affecting the voyage to Archangel." The question of estoppel in maritime actions will be passed over for the moment.

The second libel of Paine, the time charterer, against the shipowner, has a double aspect, claiming to recover damages for which he may possibly be held liable to the subcharterer by reason of the forbidding of the Archangel voyage, and also to recover for profits lost to him for the use of certain space alleged to have been reserved to him from the subcharterer.

The claim of Paine for indemnity against liability to the subcharterer may be dismissed from consideration at the outset, for the reason that the allegation of the twenty-first article of his answer to the first libel, duly verified, sets forth, in substance, that the respondent Paine entered into an adjustment with Gaston, Williams & Wigmore Steamship Corporation, whereby he duly assigned to that corporation the entire charter, which had been derived through mesne assignments from the New England Fuel & Transportation Company, and whereby the said Gaston, Williams & Wigmore Steamship Corporation was substituted for Paine in respect to the operation of the vessel under the charter, and that said adjustment was in full settlement and discharge of all obligations of Paine to Gaston, Williams & Wigmore, "and in discharge of all damages claimed in the libel from this respondent, and constituted an accord and satisfaction."

This allegation is supported by the record evidence herein, documentary and oral. This assignment of charter was dated June 27, 1919, after abandonment of the Archangel voyage. The evidence shows that, at that time, the time charter was valuable, as the rate of hire under the charter was considerably less than the going market rate for space. At the time of the assignment of the entire charter (which assignment was not prohibited by the original instrument), Gaston, Williams & Wigmore became the entire owners of what, presumably, was a valuable time charter, notwithstanding the cancellation of the Archangel trip. The Melrose was then "an $8 vessel in a $10 market."

The libels were not filed until 1923, upwards of four years after the several transactions. In the interim, no claim had ever been presented to the shipowner by either the time charterer or the subcharterer. For the moment, the question of laches will be passed. The terms of the original or time charter will first be considered.

[2] The libels assert that the time charter, by its terms, permitted a voyage to Archangel. This document has two clauses, seemingly in conflict. On the first page is a typewritten clause, stating the limits, concluding with these words: "And/or Europe and/or Australia, excluding White or Black Sea and the Baltic out of season, the Magdalena river and all unsafe ports." Thereafter the language continues, in printed form, as follows: "As the charterers, or their agents, shall direct, on the following conditions."

Thereafter are 33 numbered paragraphs. Nos. 29 to 33, inclusive, are on the reverse side of the document and are typewritten. Both sides of this single sheet bear the signatures of the parties. Paragraph 31 (on the second or reverse side) provides for the payment of $150,000 charter hire to cover the last 2 months of the 12 months' service, to be paid within 7 days after delivery of the vessel. The final paragraph (number 33) contains various warranties by the charterer, which the record shows are in the same language as the "institute warranties" in force at that time. Included in paragraph 33, is the following: "Also warrant not to sail for or from any port or place on the north coast of Europe between North Cape and Cape Kanin, and not to proceed east of Cape Kanin in the Arctic Ocean."

An examination of the map shows that Archangel is on the north coast of Europe and is between North Cape and Cape Kanin. Marine insurance men and shipbrokers of long experience testified that this warranty was understood in the shipping and insurance world as excluding the port of Archangel, although the map itself would seem to be conclusive, without the necessity of such testimony. This examination of the map is satisfying of the fact, whether the limit be determined by following the coast line around between the two capes, or whether it be determined by longitude. I am satisfied that the language quoted from paragraph 33 prohibits a voyage to Archangel. What, if any, is the effect, however, of the provision on the face of the charter, reading "and/or Europe and/or Australia, excluding White or Black Sea and the Baltic out of season, the Magdalena river and all unsafe ports"?

It is argued, with much force, that the clause which excludes the White Sea "*out of season*" would, inferentially, permit a voyage *in season*, which the evidence shows would have been for a short period during the summer, when the voyage was contemplated. I am of the opinion that this limits provision is a general provision, an outside range, of which the charterer may avail himself without reference to a particular port or locality.

Certainly this clause, excluding the White Sea "out of season," cannot be held, inferentially, to give this limits provision greater range, and to nullify a specific warranty and specific exclusion, which is one of the conditions of the charter contained in paragraph 33. To put it another way, a specific provision (paragraph 33) entirely excluding certain ports or places on the north coast of Europe at all times, is much more forcible than a clause excluding a given locality "out of season." The latter forbids a voyage to such a locality at certain times of the year. The specific provision of paragraph 33 forbade such a voyage at any time. The two negatives are not in conflict, but one is broader than the other. The logic is that the greater includes the less.

[3] The court might go further, and speak of the greater weight to be given to a "warranty"; but it would seem to be unnecessary. The subcharterer, of course, could get no greater title or control over the ship than the original charterer.

[4] As to the second theory of the libelants, that the shipowner was estopped from prohibiting the Archangel voyage, or that he had waived the conditions of the charter, if they did in fact prohibit such voyage, merits consideration. It appears that the shipowner received $150,000 on account of charter hire before the Archangel voyage was forbidden. This money was paid directly to the owner by the subcharterer for the account of Paine, the charterer. There is some evidence in the record that the shipowner had knowledge of the loading of the cargo destined for Archangel.

The subcharter to Gaston, Williams & Wigmore Steamship Corporation did not limit the subcharterer's use to an Archangel voyage, but gave a range of other ports. The subcharterer was charged with the obligation of knowing the limitation of his subcharter, which could not enlarge the terms of the original charter to Paine. The evidence further indicates that at some time during the loading of the cargo, and before the cancellation of the voyage, the provisions of the charter prohibiting the Archangel voyage were the subject of discussion and negotiation between all of the parties, evidently with a view to modifying the charter, so as to permit the contemplated Archangel voyage. These negotiations, however, failed to bring about a modification of the charter.

[5, 6] It has been well said that estoppel is a shield, and not a sword. It is available for protection, and cannot be used as a weapon of assault. See Dickerson v. Colgrove, 100 U. S. 578, 580, 581, 25 L. Ed. 618. Estoppel may be invoked where conduct or statements have positively misled a party and are acted upon by him in good faith, to his prejudice. Where the conditions are known to the parties, or they both have the same means of ascertaining the truth, and where they are under a duty to ascertain the truth, there can be no estoppel. See Oklahoma v. Texas, 268 U. S. 252, 257, 45 S. Ct. 497, 69 L. Ed. 937; Brant v. Virginia Coal & Iron Co., 93 U. S. 326, 335, 23 L. Ed. 927.

Both Gaston, the subcharterer, and Paine, the charterer, with the time charter before them, were charged with its limitations. The payment of the $150,000 to the owner by the subcharterer for Paine's account, presumably, was made because of Paine's inability to pay it himself according to the positive requirements of the time charter. Proper credit was given to the subcharterer for this money, from Paine on account of the amount due from the subcharterer to Paine under the subcharter. In other words, the payment was pursuant to a definite legal obligation. The fact that it was arranged

through Gaston directly to the owner cannot enlarge Gaston's rights.

In view of the court's conclusion, it is unnecessary to consider other questions, such as laches, which militate against the libelants.

The libels will be dismissed.