## VANN v. FEDERAL RESERVE BANK OF RICHMOND.

District Court, E. D. Virginia.
Nov. 1, 1929.

R. E. Whiting, of Columbia, S. C., for complainant.

M. G. Wallace, of Richmond, Va., for defendant.

GRONER, District Judge.

A part of the facts is stipulated. In addition, some oral evidence was taken which is not disputed. The case is as follows: On March 29, 1928, the Reserve Bank had received from its correspondent banks, and had on hand for collection, checks drawn on the First National Bank of St. George amounting to $8,985.16, which on that day it mailed to that bank for payment. On March 30th it had on hand $11,059.19 of checks on the St. George Bank, which likewise it mailed to that bank for payment. On the same day, viz. March 30th, it directed the manager of its Bank Relations Department, Mr. Garrett, who was then in Charleston, S. C., to leave there and go immediately to St. George, and demand of the St. George bank either payment or return of the checks contained in the two letters of the 29th and 30th. On arrival at St. George about 10:30 a. m. of March 31st, Mr. Garrett was informed by the president of the St. George bank that the bank was not able to pay the checks, and the same were surrendered to Mr. Garrett and the checks themselves noted for protest, but notice of protest was not mailed to the parties to said checks. The agent of the Reserve Bank was then informed that the St. George bank was making an effort to obtain money at Charleston, S. C., and that the continued operation of the bank would depend upon the success of that effort. These negotiations having proved

abortive, the cashier of the St. George bank notified Garrett to that effect at 4 o'clock a. m. on the morning of April 2 (Monday), and asked his advice. He advised that the national bank examiner be called, and this the cashier of the St. George bank did from Garrett's hotel room, informing the examiner that the board of directors of the St. George bank would meet at 8:30 Monday morning (April 2), and requesting him to come to the bank at once, stating that they were about ready to deliver the bank to him. The bank examiner was some distance away, and could not arrive in time for the directors' meeting or until a little before midday. In the meantime Garrett, who was unwell and unable to return to St. George, called upon another agent of the Reserve Bank in the neighborhood to report at once to him, and, upon his reporting around 9 o'clock, gave him the information he had with relation to the condition of the St. George bank, delivered to him the checks contained in the two letters from the Reserve Bank of the 29th and 30th, and requested him to do all needful things in connection therewith. This representative of the Reserve Bank went to the St. George bank, and found the bank open and the officers waiting for the bank examiner to arrive. The representative of the Reserve Bank presented the checks on the St. George bank, and requested payment. The cashier of the St. George bank thereupon paid (by order on the funds of the St. George bank with the Reserve Bank) $8,027.02 of checks contained in the letter of March 29, received the checks for this amount, but at the same time informed him that he was unable to pay any of the checks contained in the letter of March 30th.

At 10:30 that morning the St. George bank closed its doors and was taken charge of by the national bank examiner.

This is a notice of motion brought on behalf of the receiver of the St. George bank against the Reserve Bank to recover the amount of the payment just hereinabove mentioned on the ground that the same was a preference, and was therefore void under the provisions of section 52 of the National Bank Act (12 USCA § 91). The section is as follows:

"All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void. * * * "

In my opinion, the transaction out of which the claim here arises was directly in the teeth of this statute. There can be no doubt that the St. George bank was insolvent, not only at the time it closed its doors on April 2d, but also at the time the cash letters of March 29th and 30th were mailed. On the 31st the cashier of the bank admitted its inability to pay in the ordinary course of business checks drawn on it by its depositors, but held out the possibility—utterly without reasonable justification—that it might be able to borrow money from another bank in Charleston as a reason why it should continue another twenty-four hours of life, and on this slim chance the Reserve Bank refrained from sending out notice of protest of the dishonored checks to the parties in interest until the following Monday. By Sunday night the faint hope of the preceding Saturday was extinguished, and the cashier of the St. George bank went directly to the representative of the Reserve Bank and informed him of the fact, and in his presence notified the bank examiner to come to the bank as soon as he could and take possession. It was therefore not only the case of an insolvent bank, but full and complete knowledge of its insolvency on the part of all concerned. And the effect of what was then done with knowledge of this condition was to prefer one creditor of the failing bank to another, that is to say, to enable its depositors whose checks aggregated above $8,000 to be taken up and paid, and to that extent to receive their money in full, while the depositors whose checks were forwarded in the letter of the 30th as well as all other depositors and creditors of the bank were to the extent of the payment then made prejudiced in the application of the assets of the bank to the just and equal payment of its debts.

The Reserve Bank, however, insists that, notwithstanding all that is said above, the payment of the checks in question was not a preference because it was a payment in the ordinary course of business, and was in all respects analogous to the payment of checks of depositors made in the ordinary course, but after the insolvency of a bank and with

knowledge of the same on the part of its officers. Whatever rights a receiver of an insolvent bank may have against a depositor of the bank, who without knowledge of its insolvency withdraws his money a day or two before failure, it is not necessary here to decide, but there can be no doubt, I think, that, if there be added to the facts stated in the foregoing proposition knowledge on the part of the depositor of insolvency, the transaction, even though apparently in the ordinary course of business, would be subject to be set aside and annulled as in conflict with the statute, for if, as sometimes happens, knowledge of the impending closing of a bank is given a favored depositor as a result of which he is enabled to withdraw his deposit, the effect of such a withdrawal would be to create a preference in his behalf, voidable and recoverable under the express terms of the statute.

■ It is, however, further insisted by the Reserve Bank that, if all the foregoing be conceded, it is still not liable in this action because it was a mere agent; that its agency was understood by all parties and was a matter of agreement—in fact, the result of a lawful regulation, that is to say, a legal requirement that it should act as the agency for the collection of the checks for account of which the payment was made, and that, having collected the money and remitted it to the owners of the checks without notice of any claim by the receiver of the St. George bank until after payment, the actual beneficiaries of the preference rather than itself should be required to indemnify the receiver. The point is not without difficulty, and I have not been furnished with any authority on the subject, nor have I been able to put my hands on any directly in point. My conclusion, however, is that the Reserve Bank may not escape on this ground. I agree there can be no doubt that in the transaction the Reserve Bank acted wholly as an agent of the owners of the checks; that is to say, the member banks which had sent them to the Reserve Bank for collection. Carson v. Reserve Bank, 226 App. Div. 225, 235 N. Y. S. 197. Federal Reserve Bank of Richmond v. Early (C. C. A.) 30 F. (2d) 198. I further agree it is equally true that, under the rules established for the regulation of the Reserve Bank, it was required to accept checks upon solvent member banks and to present the same for collection, and by agreement was not liable to the depositing bank, except under circumstances not necessary to detail here, unless collection was made.

The Reserve Bank in this case would have assumed no liability, therefore, if on Saturday, the 31st of March, it had caused the checks on which payment had been refused to be dishonored and had returned them to the depositors, and, while doubtless it had a right to extend the period of notice of dishonor until the following Monday in the hope and expectation that the bank might then be in funds to pay the checks in the regular course, it had no right, in my opinion, after the most explicit proof of insolvency on the part of the St. George bank, and of its inability to continue in business, either to make a further presentation of the checks or to accept the money—without itself assuming liability for its participation in a tortious act. The payment then made was a breach of trust. It was likewise a breach of the statute. Knowledge of this was peculiarly in possession of the representative of the Reserve Bank. It was obviously also in the possession of the cashier of the local bank, for at the very moment that he authorized the transfer of his bank's funds to the Reserve Bank he was awaiting the bank examiner to deliver the bank to him for liquidation, and within half an hour this was done and the doors of the bank were closed. It is, I think, idle to say that the bank was at the moment open and doing business, for the fact is it was not doing business. It had received deposits, it is true, but no deposits so received had been put through its books, but had been put aside, because to have done otherwise would have created criminal liability.

■ The applicable rule of liability on the part of an agent is that, if money has been voluntarily and by mistake paid to him, and, before he receives notice of the mistake, he has paid it over to his principal, he will not be personally liable therefor. Mechem on Agency, § 561, and cases cited. But, where the element of duress or forced payment or of knowingly participating in an unlawful act exists, the rule is different. In such cases the relationship of principal and agent does not exist—certainly not to the extent of relieving the agent whose personal participating made possible the wrong committed. In such cases both the principal and agent are wrongdoers, and may be sued jointly or severally. If the collection of the money by the bank was a violation of the statute, and I have reached the conclusion that it was, and if the Reserve Bank knew that the effect of the payment would be to violate the statute and create a preference though it did not itself profit

thereby, the act was obviously wrong, and the party participating in such a wrong may not exonerate himself by showing that he was acting for another. Upon this general subject, see the case of Elliott v. Swartwout, 10 Pet. 137, 9 L. Ed. 373, in which there is a very satisfactory discussion of the question of the personal liability of agents in the receipt of money and the payment thereof to the principal. See, also, Shearman & Redfield on Negligence, § 112, and Wharton on Negligence, § 535.

Judgment will go for plaintiff with interest and costs, but without prejudice to the right of the Reserve Bank in appropriate proceedings to demand of its depositing member banks reimbursement to the extent of its loss.