## HIRNING v. FEDERAL RESERVE BANK OF MINNEAPOLIS, MINN.
### No. 9073.

Circuit Court of Appeals, Eighth Circuit.
Aug. 24, 1931.

J. H. Colman, of Minneapolis, Minn. (John Junell and Junell, Oakley, Driscoll & Fletcher, all of Minneapolis, Minn., on the brief), for appellant.

A. Ueland, of Minneapolis, Minn. (Sigurd Ueland, of Minneapolis, Minn., on the brief), for appellee.

Before KENYON and BOOTH, Circuit Judges, and DEWEY, District Judge.

BOOTH, Circuit Judge.

An action at law was brought by appellant, plaintiff below, to recover from appellee the sum of $21,355.82, being the amount of two remittances made by the Farmers' National Bank of Brookings, S. D., to the Federal Reserve Bank of Minneapolis, on the ground that said remittances constituted unlawful preferences under section 5242, Rev. St. (12 USCA § 91).

A jury was duly waived, and the case was tried to the court.

At the close of the evidence, plaintiff moved for judgment in his favor; defendant moved for judgment of dismissal on the merits. The latter motion was granted, and judgment was entered for defendant. This appeal followed.

The relevant statute under which the action was brought reads as follows: "All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction or execution, shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any state, county, or municipal court." Rev. St. § 5242, 12 USCA § 91. .

From the findings, the admissions in the pleadings, and the undisputed evidence, the following facts appear: The Federal Reserve Bank of Minneapolis (hereafter called the Reserve Bank) on November 13, 1926, received from certain of its member banks for collection checks on the Farmers' National Bank of Brookings, S. D. (hereafter called the Brookings Bank), amounting to $22,114.-22. On the same day, the Reserve Bank, as agent of said member banks, forwarded said checks to the Brookings Bank for collection. On November 15, 1926, the Reserve Bank, as agent for certain member banks, received for collection other checks on said Brookings Bank amounting to $15,020.88; and on the same day forwarded these checks to the Brookings Bank for collection. The Reserve Bank, as agent, had authority to receive cash or drafts for the checks so sent. On the 16th of November, the Brookings Bank accepted most of said checks, and on that day sent to the Reserve Bank two drafts drawn on the Reserve Bank and payable to its order, one for $22,059.11 covering the checks accepted from the first list, and one for $14,-880.86 covering the checks accepted from the second list. The drafts were drawn by Mr. Haroldson, cashier of the Brookings

Bank. In the usual course of business, the drafts would have been drawn on some bank other than the Reserve Bank, but in this instance they were drawn on the Reserve Bank because the Brookings Bank realized that it would not reopen the following day and the drafts would not clear on November 17th if the drawee banks received prior notice of the closing of the Brookings Bank. The checks were charged by the Brookings Bank against the various drawers who were depositors in said bank on November 18th.

At the time of sending the two drafts to the Reserve Bank, the Brookings Bank did not have in the Reserve Bank sufficient reserve account to meet the drafts. Accordingly, and in order to provide funds with which to meet the drafts, the Brookings Bank, on November 16th, by its cashier, Mr. Haroldson, wrote a letter to the Reserve Bank inclosing collection items belonging to the Brookings Bank for collection by the Reserve Bank. These items on their face amounted to $10,029.07, but the Reserve Bank collected thereon only $8,355.82. This letter inclosing the collection items was not mailed until late in the evening of November 16th, and until after a resolution had been passed by the board of directors suspending the operation of the bank. (Resolution in the margin.[1]) On the afternoon of the 16th, the Brookings Bank also made up a bundle of currency amounting to $13,000, and this was sent to the Reserve Bank on the morning of November 17th. On the morning of November 17th, the Reserve Bank was notified by the Brookings Bank by telephone that the Brookings Bank had suspended operations. On the same morning, the Reserve Bank received the collection items which the Brookings Bank had mailed on the 16th. The Reserve Bank made the collections and credited the proceeds to the reserve account of the Brookings Bank, provisionally on the 17th, and finally on the 22d. On November 18th, the Reserve Bank received the $13,000 currency sent by the Brookings Bank, and credited that amount to the reserve account of the Brookings Bank.

These remittances by the Brookings Bank to the Reserve Bank of the collection items and of the currency were made by the Brookings Bank in contemplation of insolvency, and after the Brookings Bank was in fact insolvent. Mr. Haroldson had been in Minneapolis on November 15th and had had a conference with Mr. Young of the Reserve Bank there, with a view to borrowing money to help the financial situation of the Brookings Bank. The condition of the Brookings Bank was gone into, the depletion of its reserve, and the decrease in its deposits. Mr. Haroldson testified that, as a result of this conference, he reached the conclusion as managing officer of the Brookings Bank that the only thing to do was to close the bank, and that he returned home, reaching Brookings on the morning of November 16th, and took steps to close the bank; that one of the steps taken was to call the meeting of the board of directors; that the cash letter with the collection items and the $13,000 currency were sent after he had stated to the board of directors the condition, after the resolution above mentioned was passed, and in the execution of his plan of closing the bank.

The bank examiner took possession of the bank on November 18th, and a receiver was appointed December 3d.

The Reserve Bank, on receiving from its member banks on November 13th and November 15th the checks on the Brookings Bank, had credited those checks to the member banks. On receiving word on November

---

[1] "Farmers National Bank
"Capital and Surplus $65,000.00
"Brookings, So. Dak.
"November 16, 1926.
"W. A. Caldwell, President.
"O. J. Otternes, Vice Prest.
"L. A. Otternes, Vice Prest.
"H. F. Haroldson, Cashier.
"J. Clevan, Asst. Cashier.
"J. L. Murphy, Asst. Cashier.
"A. R. Johnson, Asst. Cashier.
"F. M. Story, Asst. Cashier.

"Special Meeting of Board of Directors.
"Due to heavy withdrawals of deposits, a special meeting of the Board of Directors was held this 16th day of November to discuss plans of raising funds to meet the withdrawals, and after a general discussion it was unanimously decided that the Directors were unable to raise sufficient funds for this purpose. Also due to the fact that it is impossible at this time to estimate the amount that would like- ly be withdrawn, owing to general conditions and rumors that have been carried for some time. Therefore a motion was made by L. A. Otterness and seconded by H. F. Haroldson that the following resolutions be passed:
"Resolved That due to the depletion in our reserve, the heavy withdrawals of deposits, and our inability to raise sufficient funds to meet these demands, and considering it to be for the best interest of the depositors and creditors, it was the unanimous vote of all the Board of Directors to suspend operation pending reorganization and the Chief National Bank Examiner of Minneapolis, Minn., be notified immediately.
"W. A. Caldwell
"O. J. Otternes
"A. M. Wold
"C. D. Kendall
"H. F. Haroldson
"O. G. Oylar
"M. R. Staven
"L. A. Otterness
"Arthur R. Johnson."

17th of the failure of the Brookings Bank, these credits to the member banks were reversed.

On December 17, 1926, the Reserve Bank wrote to the member banks which had sent the checks on the Brookings Bank for collection as follows:

"Federal Reserve Bank, Chicago, Illinois.

"Gentlemen: Referring to the transit items listed below on the Farmers National Bank of Brookings, South Dakota, received from you November 15, 1926, and charged back for non-remittance and for no return of the items, we write to say that we will endeavor to have the item made chargeable against the reserve account with us of the Brookings bank. If we succeed, we will remit to you in full for your item, but should we fail, the charging of the items back to you will have to stand."

The Reserve Bank did not enter on its books the two drafts from the Brookings Bank until January 27, 1927, as will be noted later.

Following the appointment of the receiver for the Brookings Bank, correspondence was had between the Reserve Bank and the receiver relative to the state of the accounts between the two banks and relative to certain items not here involved. In a letter from the receiver of the Brookings Bank dated January 3, 1926, the following appears:

"Federal Reserve Bank, Minneapolis, Minn.

"Gentlemen: I am enclosing copy of letter received today from the Comptroller of Currency regarding the account of the Farmers National Bank with you. * * *

"You will also note regarding the unpaid drafts which is being left to your wishes in the matter. Personally as Receiver I would not raise any objection to you charging the account with these drafts and believe that it would simplify matters if you would do so."

The letter referred to in the receiver's letter was from J. E. Fouts, assistant supervising receiver, and, so far as here material, read as follows: "As to the unpaid drafts held by the reserve bank which represent an attempted remittance by the Brookings bank to the reserve bank of the proceeds of the cash collection letters, you are advised that if the reserve bank desires and elects to assert ownership of the items involved, it has the right to do so, and if it takes this position it is believed that you cannot prevent it from charging the unpaid drafts to the account of your trust."

In answer to the receiver's letter, counsel for the Reserve Bank wrote as follows:

"January 17, 1927.

"L. C. Kranhold, Receiver, Farmers National Bank, Brookings, So. Dak.

"Dear Sir: This bank has directed me to write you in answer to your letter of the 3rd inst. accompanied by copy of letter to you of December 29th from the Assistant Supervising Receiver, Division of Insolvent National Banks.

"Acting upon the statements in your letter and in that of Mr. Fouts, the assistant supervising receiver, the Federal Reserve Bank has charged up against the reserve account of the Farmers National Bank of Brookings the two drafts for respectively $22,114.22 and $15,020.88 described in my letter to you of December 16th."

On January 27, 1927, the Reserve Bank charged the two drafts which the Brookings Bank had sent on November 16, 1926, against the reserve account of the latter bank; and on January 27, 1927, also, the Reserve Bank again credited the member banks with the amounts of the checks on the Brookings Bank which they had sent in to the Reserve Bank on November 13th and November 15th.

From the foregoing facts it seems clear: (1) That the passage of the resolution by the board of directors of the Brookings Bank on the evening of November 16th was an act of insolvency; that therefore the Brookings Bank was insolvent at the time it sent the currency and the collection items to the Reserve Bank, and that these transfers were made in contemplation of insolvency [Nat. Security Bank v. Butler, 129 U. S. 223, 9 S. Ct. 281, 32 L. Ed. 682; Federal Res. Bank v. Omaha Nat. Bank, 45 F.(2d) 511 (C. C. A. 8); Ball v. German Bank, 187 F. 750 (C. C. A. 8)]; (2) that on November 16th, when the Brookings Bank accepted the checks of the member banks and sent to their agent, the Reserve Bank, the two drafts, it became a debtor to the member banks, and they became its creditors; (3) the transfers of the currency and the collection items by the Brookings Bank were void as within the statute. They were made after an act of insolvency and in contemplation of insolvency; they were made with a view to prevent the application of the assets of the Brookings Bank in the manner prescribed by the statute; they were made with a view to the preference of one creditor to another. If the transfers stood, some creditors of the Brookings Bank would receive a preference over other creditors; the member banks

which had owned the checks were the creditors, and they would receive a preference by having their claims paid in full.

 It is contended by the appellee that the checks sent by the Reserve Bank to the Brookings Bank constituted a trust fund, and that this trust fund has been traced into the currency and collection items sent by the Brookings Bank to the Reserve Bank.

The trial court seems to have adopted this view as one of the grounds of its decision in ordering judgment for defendant.

We do not agree with this contention. It must be remembered that the checks sent to the Brookings Bank by the Reserve Bank were all of them checks drawn on the Brookings Bank. When the Brookings Bank accepted the checks, this produced no additional funds in its hands. Its assets were not augmented. No trust fund was created. If there was no trust fund, there could, of course, be no tracing of the trust fund into any assets of the Brookings Bank. The doctrine that a trust fund is created when checks drawn on bank A by a depositor therein are sent to bank A by bank B for collection, i. e., for payment, has been disapproved by the decisions in this circuit, as has also the doctrine that the forwarding bank or its principal has a general lien on the assets of the drawee bank for the payment of such checks. Rorebeck v. Benedict, etc., Co. (C. C. A.) 26 F.(2d) 440; Farmers' National Bank v. Pribble (C. C. A.) 15 F.(2d) 175; Larabee Flour Mills v. First Nat. Bank (C. C. A.) 13 F.(2d) 330; Macy v. Roedenbeck (C. C. A.) 227 F. 346, 352, L. R. A. 1916C, 12; Beard v. Independent Dist. (C. C. A.) 88 F. 375.

██ But even if it should be conceded that the Brookings Bank was an agent for the collection of the checks drawn on itself, and that the checks constituted trust property, yet the owners of the checks would have no preference over other creditors of the Brookings Bank unless there was a specific identification of the trust fund and a clear tracing of the same into the assets of the insolvent Brookings Bank. Farmers' Nat. Bank v. Pribble, supra, and cases cited; Dickson v. First National Bank, 26 F.(2d) 411 (C. C. A. 8); Macy v. Roedenbeck, supra.

In the Pribble Case, this court, speaking by Judge Walter H. Sanborn, said (page 176):

"'It is indispensable to the maintenance by a cestui que trust of a claim to preferential payment (by a receiver) out of the proceeds of the estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came to the hands of the receiver, and then the claim can be sustained to that fund or property only, and only to the extent that the trust property or its proceeds went into it. It is not sufficient to prove that the trust property or its proceeds went into the general assets of the insolvent estate and increased the amount and value thereof which came to the hands of the receiver.' * * *

"The doctrine that a cestui que trust, whose property had helped to swell the general assets of a corporation which was or became insolvent, has a prior right to or interest in those general assets, without specific identification and tracing of such claimant's property, was again expressly repudiated by this court in the case last cited. The fact that the claimant's property paid or reduced the indebtedness or liability of the insolvent corporation, so that it will pay a larger percentage of its debts, justifies no lien on its assets by or preference in payment to the cestui que trust (1) because such a reduction of indebtedness does not increase the property or the value of the property of the insolvent; and (2) because the property of the claimant so used to pay a part of the insolvent's general indebtedness or liability never goes into, and therefore cannot be traced into, the property or assets of the insolvent which subsequently come into the possession of the receiver."

That there has been no such tracing here, we think too clear for argument.

But it is contended that there was a segregation by the Brookings Bank in sending the currency and the collection items to the Reserve Bank. The answer is that such segregation was made after the insolvency of the Brookings Bank and at a time when it had no authority to make such a segregation. The segregation items were not the proceeds of the collection of the checks. Indeed, no such proceeds of collection came into the hands of the Brookings Bank. There was simply a bookkeeping transaction—a shifting of credits.

██ Another contention of appellee is that the Reserve Bank was not a creditor of the Brookings Bank, but merely an agent of the member banks in forwarding their checks for collection; and hence that the Reserve Bank cannot be held liable for a preference. This view also was taken by the trial court.

We agree with the contention that the Reserve Bank was, not a creditor of the Brookings Bank but an agent of the member banks. We are of the opinion, however, that the question of liability of the Reserve Bank in this case is not necessarily disposed of by the finding that it was not a creditor.

If we are correct in what we have previously said, there was a preference in favor of some of the creditors of the Brookings Bank growing out of the transfers of the currency and the collection items to the Reserve Bank. The Reserve Bank participated in those transfers. It received the property transferred and it, in turn, transferred it to the creditors of the Brookings Bank. The action of the Reserve Bank as agent helped bring about the preference. What the Reserve Bank did, it did with full knowledge of the insolvency of the Brookings Bank.

Under these circumstances we think the Reserve Bank can and should be held liable to the receiver of the Brookings Bank. Ordinarily, where an agent receives money paid to him for his principal, to which his principal is not entitled, and without knowledge of the mistake pays the money to his principal, the agent is not liable. But that is not this case. The Reserve Bank had full knowledge of all the essential facts. Under such circumstances, it could not rightfully pay over to its principals the money which had come into its hands from the insolvent Brookings Bank.

In Larkin v. Hapgood, 56 Vt. 597, one Sawyer paid certain moneys to the defendant who was acting as agent for his sister, and the defendant paid the moneys over to his sister. The payment to the defendant was illegal, as it was made when Sawyer was insolvent to the knowledge of the defendant and was made with the intent to prefer the defendant's sister, a creditor of Sawyer. The court held that the plaintiff, Sawyer's assignee in insolvency, could recover from the defendant, saying (page 600): "Where an agent receives money which the law prohibits him from taking, it is no defence to a suit brought by the party from whom it was unlawfully taken, or one who has acquired the right to sue for the benefit of his estate to show that he has paid the money over to his principal."

In Ex parte Edwards, 13 Q. B. Div. 747, in which somewhat similar circumstances existed, it was said (page 751): " * * * If a person is employed as an agent to do a particular thing, and receives money for his principal in the course of his agency, still, if the person who employs him has no right to the money, the agent is not entitled to hand it over to him, and is liable for it to the true owner if he does so hand it over."

In the case of Vann, as Receiver, v. Federal Reserve Bank of Richmond (D. C.) 47 F.(2d) 786, facts existed which, in many respects, were quite similar to those in the case at bar. The Federal Reserve Bank of Richmond had forwarded certain items for collection to a bank at St. George. Under facts which clearly showed insolvency and contemplation thereof, the St. George Bank delivered a draft to the Federal Reserve Bank for certain of the items. Before notice of any claim on the part of the receiver of the St. George Bank, the Federal Reserve Bank paid over the amount of such draft to its depositing banks. The court held the Federal Reserve Bank liable, notwithstanding such payment, since the payment was made in violation of section 5242, Revised Statutes, and was void, and, the Federal Reserve Bank having participated in an illegal act, it could not exonerate itself by showing it was acting for others. In its opinion the court said (page 788): "If the collection of the money by the bank was a violation of the statute, and I have reached the conclusion that it was, and if the Reserve Bank knew that the effect of the payment would be to violate the statute and create a preference though it did not itself profit thereby, the act was obviously wrong, and the party participating in such a wrong may not exonerate himself by showing that he was acting for another." See, also, Elliott v. Swartwout, 10 Pet. 137, 9 L. Ed. 373; United States v. Pinover (D. C.) 3 F. 305, 309; Wright v. Eaton, 7 Wis. 595, followed in Blizzard v. Brown, 152 Wis. 160, 139 N. W. 737; Notes, Ann. Cas. 1912D, 721; 20 A. L. R. 123; see Mechem on Agency (2d Ed.) §§ 1440, 1441; 1 Am. & Eng. Encyc. of Law (2d Ed.) p. 1131; 2 C. J. p. 823, § 497.

It is further contended by appellee that the correspondence above set out, and the fact that no answer was made by the receiver of the Brookings Bank to the letter of counsel for the Reserve Bank dated January 17, 1927, estopped the receiver of the Brookings Bank from claiming that the Reserve Bank could not rightfully charge the drafts which the Brookings Bank had sent against the reserve account of the Brookings Bank, including therein the currency and the collection items, and pay over to the member banks the amounts of the several

388

checks which they had sent to the Reserve Bank on November 13th and 15th.

Assuming, but without deciding, that the receiver of a national bank may be subject to an estoppel which would prevent him from carrying out the purposes of the National Banking Act, yet we think this contention of estoppel is without merit, for several reasons: First, we think the letters of the receiver of the Brookings Bank and the letter of Mr. Fouts do not, by fair construction, refer to the paying over of money by the Reserve Bank to the member banks, but simply to a disposition of the drafts; second, the statement in the Fouts letter was conditional on the Reserve Bank's electing to assert ownership of the checks which it had sent to the Brookings Bank. This condition was not fulfilled by the Reserve Bank, but, on the contrary, the Reserve Bank has at all times maintained that the member banks were the owners of the checks, and that it was a mere agent; third, the Reserve Bank apparently did not rely on failure of the receiver of the Brookings Bank to reply to the letter of January 17, 1927, because that letter states that the Reserve Bank had already charged up the two drafts against the reserve account of the Brookings Bank; fourth, the Reserve Bank is not in a position to set up an estoppel. All of the essential facts in the situation were known to the Reserve Bank as fully as they were to the receiver of the Brookings Bank or to Mr. Fouts, and probably even more fully. Under such circumstances, estoppel would not arise. 21 C. J p. 1129, § 131, p. 1131, § 132; 11 Am. & Eng. Encyc. of Law, p. 434; Pomeroy's Eq. Juris. (3d Ed.) § 810; Bailey v. Lisle Mfg. Co., 238 F. 257, 268 (C. C. A. 8); Fellows v. National Can Co. (C. C. A.) 257 F. 970, 977, and cases cited; First Nat. Bank of Fairbanks v. Noyes (C. C. A.) 257 F. 593; Andrew Jergens Co. v. Woodbury, Inc. (D. C.) 273 F. 952, 965, affirmed (C. C. A.) 279 F. 1016; Murphy v. Paine (D. C.) 15 F.(2d) 570, 572; see Sturm v. Boker, 150 U. S. 312, 335, 14 S. Ct. 99, 37 L. Ed. 1093.

What the Reserve Bank apparently tried to do was to build up the reserve account of the Brookings Bank after the latter's insolvency; and then exercise the right of set-off, not in its own behalf, but in behalf of the member banks, against this reserve account so built up. We think neither of these things could legally be done.

In view of the facts that this action was brought to recover from the Reserve Bank on the theory that it was a creditor of the Brookings Bank, and the evidence has failed to show this, and in view of the facts disclosed by the present record which, in our opinion, point to liability on the part of the Reserve Bank, we think the ends of justice will be best served by reversing the judgment and remanding the cause, with instructions to grant a new trial, first granting leave to the parties to amend their pleadings so as to cover issues suggested in this opinion.

It is so ordered.