## UHL v. FIRST NAT. BANK & TRUST CO OF KALAMAZOO, MICH.

### No. 3636.

District Court, W. D. Michigan, S. D.

Feb. 15, 1935.

James T. McAllister, of Grand Rapids, Mich., for plaintiff.

Stearns, Kleinstuck & Stapleton, of Kalamazoo, Mich., and Knappen, Uhl, Bryant & Snow, of Grand Rapids, Mich., for defendant.

RAYMOND, District Judge.

This suit is brought under section 91, Title 12 U.S.C.A. (R.S. sec. 5242), which in effect declares null and void all payments of money by a national bank to creditors after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by the National Bank Act, or with a view to the preference of one creditor to another. The obvious purpose of this section and of section 194 of the same title is to secure equality of distribution of the assets of an insolvent bank among its creditors. See Smith v. Baldwin, 63 App.D.C. 72, 69 F.2d 390, and Jennings, Receiver v. United States Fidelity & Guaranty Company, 294 U.S. 216, 55 S.Ct. 394, 79 L.Ed. 869, 99 A.L.R. 1248, Feb. 4, 1935. Plaintiff seeks recovery of the sum of $115,107.58 alleged to have been withdrawn in circumstances which resulted in an unlawful preference.

Waiver of jury trial was duly filed.

The parties are in accord upon many of the important facts, and recognize the fundamental principles of law applicable thereto, as stated in Nelson v. Lewis, 2 Cir., 73 F.2d 521, 523,—"If the financial condition of a bank is such that an actual act of insolvency is imminent, and the officers of the bank know or ought to know this condition, a payment to a creditor or depositor is void if not made in the ordinary course of business; an intent to prefer is presumed under such conditions, and as a rule the creditor and depositor need not know of the imminency of the act of insolvency. National Security Bank v. Butler, 129 U.S. 223, 9 S.Ct. 281, 32 L.Ed. 682; Federal Reserve Bank of Kansas City v. Omaha Nat. Bank (C.C.A.) 45 F.(2d) 511; Parks v. Knapp, 29 F.(2d) 547 (C.C.A.8); American Surety Co. of N. Y. v. Jackson, 24 F. (2d) 768 (C.C.A.9); Brill v. McInnes, 14 F.(2d) 306 (C.C.A.8)."

The controversy arises from the fact that at the time of the alleged preferential payments, a banking moratorium pursuant to proclamations of the governor was in effect in the state of Michigan. Defendant takes the position that the withdrawals complained of were made in the ordinary and usual course of business transacted between defendant and the Grand Rapids National Bank, and were not actuated by knowledge of insolvency.

The situation so far as material to the issues is as follows,—On February 11, 1933, defendant had on deposit in the Grand Rapids National Bank $121,099.46. The bank was closed on both February 12th and February 13th, the 12th falling on Sunday and the 13th being observed as Lincoln's Birthday, a legal banking holiday by statute. In the early morning of February 14th, a proclamation was issued by the governor which proclaimed the days from Tuesday, February 14, 1933, to Tuesday, February 21, 1933, both inclusive, to be public holidays, "during which time all banks, trust companies and other financial institutions conducting a banking or trust business within the state of Michigan shall not be opened for the transaction of banking or trust business, the same to be recognized, classed and treated and have the same effect in respect to such banks, trust companies and other financial institutions as other legal holidays under the laws of this state, provided that it shall not affect the making or execution of agreements or instruments in writing or interfere with judicial proceedings." The bases for the proclamation were recited to be an acute financial emergency existing in the city of Detroit and throughout the state of Michigan, and requests by the Michigan Bankers Association and the Detroit Clearing House. The Grand Rapids National Bank was closed, pursuant to this proclamation, from February 14th to February 21st, inclusive, and also on February 22nd, a legal holiday. On February 21, 1933, the governor issued a second proclamation which announced "that all banks, trust companies and other financial institutions conducting a banking or trust business within the state of Michigan prior to said holiday, shall be opened for the transaction of business at the regular opening hour on the morning of Thursday, February 23rd, 1933, provided, however, that such business shall be limited to the following functions:

"1. Reserve deposits shall be available to depositing banks and may be drawn without creating a preference.

"2. Payments to depositors in either commercial or savings departments shall be limited in amount to the proportion the total individual deposit bears to the cash on hand, available reserves in banks and United States Government bonds in each such department. Such payments shall only be allowed for necessary purposes, such as payrolls, bank transit items created on and after February 23, 1933, necessary living expenses, tax payments, or other obligations to the State of Michigan and subdivisions thereof, or to the Federal Government, drafts with bill of lading attached, Reconstruction Finance Corporation monies on deposit for welfare purposes, and such other purposes necessary for the ordinary conduct of business, providing always that no depositor shall be preferred as against any other depositor.

"3. Banking institutions may take new deposits, but such deposits shall be treated as trust deposits, and there shall be opened in each such institution a trust deposit department. Such deposits shall be payable on demand without interest and held solely for the repayment of such depositors.

"4. Banks and trust companies acting in a fiduciary capacity may perform their duties and discharge their obligations in such capacity, provided that in the exercise of such fiduciary functions debtor and creditor relationships shall not be involved.

"5. Such modifications in the foregoing limitations as may be necessary in extraordinary cases may be allowed with the consent of the State Banking Commissioner, provided, however, that no depositor shall be preferred as against any other depositor.

"The bank holiday heretofore proclaimed by me shall continue in effect subject to the foregoing limitations until otherwise ordered by me."

It will be observed that by the terms of this second proclamation, reserve deposits were permitted to be withdrawn without limitation.

On February 22, 1933, the board of directors of the Grand Rapids National Bank, in common with the other banks of Grand Rapids, decided to pay 5% to all commercial, savings, and certificate of deposit depositors; to accept so-called trust or demand deposits which would be held

278

separate and not subject to restrictions; and to return all outstanding checks dated prior to February 23, 1933. This decision was carried into effect and on the morning of February 23, 1933, the bank reopened on the limited basis indicated as to general depositors but released the deposits of other banks without limitation. The bank never reopened for regular business, but continued for about four months to accept deposits having the status of trust funds.

On or about March 20, 1933, efforts were made to bring about a reorganization of the bank by obtaining subscriptions to capital stock by depositors to the extent of 25% of their deposits under a plan whereby the entire pre-existing capital stock and surplus were to be cancelled. These efforts were continued until about June 29th. The federal authorities refused to sanction the plan, and a conservator was appointed on that date. The affairs of the bank were conducted by the conservator until September 25, 1933, when David E. Uhl was appointed receiver.

Later, certain of the assets were sold to a new bank known as the National Bank of Grand Rapids and the remaining assets were left in the hands of the receiver for liquidation. Dividends of 50% and 10% have thus far been paid to creditors largely from the proceeds of government loans obtained by pledging assets.

On April 7, 1933, an act of the Michigan legislature became effective which declared an emergency in respect to the banking and credit structure of the state, authorized the governor to declare public holidays to be observed by banks, trust companies and other financial institutions, and ratified and confirmed the proclamations previously issued in respect of the emergency, and the acts of banks performed pursuant to such proclamations. See Act 47 of Public Acts of Michigan of 1933.

There is no dispute that on February 11, 1933, defendant's net balance in the Grand Rapids National Bank (after deducting certain items returned dishonored) was the sum of $121,046.65. This entire amount was withdrawn by defendant during the period between February 23, 1933, and March 10, 1933, on which date there was an overdraft. Plaintiff concedes that defendant, in common with other depositors, was entitled during that period to withdraw 5% of its balance and that defendant was entitled to be credited with a small item

of interest, leaving the balance of $115,107.58 for which plaintiff asks judgment in this action.

The problem presented is whether or not the payments made to defendant between February 23rd and March 10th were made after the commission of an act of insolvency or in contemplation thereof, and were made with a view to prevent the application of the assets of the bank in the manner prescribed by the National Bank Act. Material aid in the solution of this question is afforded by the report of examination of the bank made between February 3rd and February 10, 1933. A summary of this report of the national bank examiners is attached as Note I. The report discloses that the control of the bank was owned by the Guardian Detroit Union Group of Detroit; that the entire capital and surplus of the bank was $1,300,000; that loans had been made to directors, officers and employees in the aggregate of $754,215.60; that of this amount over $300,000 was without collateral, and that large amounts of the deposited collateral to secure loans had become practically worthless; that the directors, officers and employees had assumed further liabilities as endorsers or guarantors to the amount of $194,056.49; and that loans had been made to corporations or enterprises in which the directors or officers were largely interested to the amount of approximately $288,000. It is clear that the margin of safety commonly afforded by capital and surplus had been largely absorbed by those charged with responsibility for the solvency of the bank.

Of the total loans and discounts of $8,473,470.59, the examiners listed $3,790,694.08 as slow, $1,227,050.37 as doubtful, and estimated losses thereof at $84,468.03.

They also reported that the bonds and securities held by the bank had depreciated to the extent of $437,881.24. The report also disclosed an indebtedness upon a portion of the bank site to the extent of $200,000. The examiners' report concluded as follows,—

"With the heavy concentration of criticised assets, the bank has a major problem confronting it, and the directors were advised of their responsibility in connection with the large amount of doubtful items now being carried. * * *

"With the large amount of money invested in banking house, the inadequacy of the bank's capital structure is readily apparent."

When it is considered that the demand deposits at the time of the report amounted to $6,776,990.26; that the time deposits amounted to $5,477,164.74; that in addition thereto the amount due banks and trust companies was $1,420,925.03; and that government deposits amounted to $67,476.-56; it is obvious that the condition of the bank was precarious prior to the proclamation of a bank moratorium.

The record discloses contradictory opinion testimony as to whether on February 11, 1933, the bank was solvent or insolvent, based upon comparative values of resources and liabilities. There can be no doubt that, if solvent at that time, it was by a narrow margin.

When there were projected into the situation following the proclamation of February 14th the hysteria and panic resulting from the fear engendered in the mind of the public for the safety of its funds, it became apparent that the bank could not reopen in the ordinary course of business. The careful examination of the assets of the bank made by and on behalf of the officers and directors during the eight days following must have forced the conclusion not only that the bank could not presently open in the usual course but .that there then existed no reasonable prospect that it would be able so to do at any future time. The most optimistic plan for reopening which was evolved was the one of about March 20th, predicated upon complete surrender of all capital stock and surplus, and surrender by depositors of their rights as creditors to the extent of 25% of their deposits, a total elimination of liabilities of an amount considerably in excess of $4,300,-000. After several months of determined effort, this plan was rejected not only by depositors but by federal authorities. The promulgation of such plan was in itself convincing evidence of recognition of a then existing state of hopeless insolvency.

No proof appears of any unusual event or circumstance which substantially affected the value of the assets of the Grand Rapids National Bank between February 22nd and March 20th. If conditions such as those suggested on that later date were necessary to permit reopening of the bank, it must be assumed that substantially the same situation existed at the dates of the alleged preferences.

The case of Hirning v. Federal Reserve Bank of Minneapolis, 52 F.2d 382, 82 A.L.R. 297, held that a resolution of the board of directors of a bank suspending the bank's operations was an "act of insolvency": The authorities agree that a national bank is "in contemplation of insolvency" when the fact becomes reasonably apparent to its officers that it will presently be unable to meet its obligations and will be obliged to suspend its ordinary operations. See First National Bank of Ortonville, Minn. v. Andresen, 8 Cir., 57 F.2d 17; Browne v. Stronach, D.C., 7 F.2d 685.

The judgment of the court is that, at least at the time of the determination by the directors of the Grand Rapids National Bank on February 22nd that the bank would reopen only on a basis which amounted to the impounding of 95% of the deposits, and which involved the dishonoring of all checks dated prior thereto, it was clear that the bank could not meet its obligations and that it could never resume its usual course of business. Judicial notice may be taken of the fact that some banks refused to close under the proclamations of the governor and that many others soon after the period of closing resumed business. Many entirely solvent banks closed and others of doubtful solvency were probably rendered insolvent as the result of the proclamations.

Defendant urges that the transactions here complained of were justified because the defendant and the Grand Rapids National Bank after February 22nd carried on the same business relations and transacted the same sort of business between themselves as they had engaged in prior to February 11, 1933, and that therefore the transactions were in the ordinary course of business as between them. It also urges that there was no thought of insolvency of the Grand Rapids National Bank at the time the withdrawals complained of were made, and that there was no reason then to believe that the bank would not open on an unrestricted basis at an early date. It is stated that the transactions between the two banks may properly be said to have been "in the ordinary course of business" within the meaning of the rule. As indicated, the court does not concur in these views.

Payment of funds by an insolvent bank to a reserve bank was held void as a preference in the case of Vann v. Federal Reserve Bank of Richmond, D.C., 47 F.2d 786. In the case of National Security Bank v. Price, C.C., 22 F. 697, it was held that after a vote of directors to close the bank and go into liquidation, any transfer of as-

sets to a creditor whereby that creditor secures a preference will be presumed to have been made with a fraudulent intent. This case was affirmed in National Security Bank v. Butler, 129 U.S. 223, 228, 9 S.Ct. 281, 32 L.Ed. 682.

The case of Varden v. City of Corbin, Ky., et al., D.C., 2 F.Supp. 840, 841, holds that where the nature and probable consequence of a transfer of notes to depositors was to prefer such depositors, the officers cannot claim that a preference was not intended. The court said:

"Whether the officers of the bank realized to the full extent that such was its condition at this time, it was 'reasonably apparent' that such was the case. They should have realized it and closed its doors.

\* \* \*

"Here, the natural and probable consequences of these transfers was to prefer, and the officers cannot be heard to say that they did not intend to prefer."

It is true that the banking moratorium created a novel situation and one which necessitates careful scrutiny of the facts in suits arising therefrom wherein recovery is sought of alleged preferences under section 91. No rule of general application can be stated. Decisions on issues arising in this field must be narrowly confined within the bounds of the facts of each case, because differentiating circumstances may lead to different results.

Emergencies, when met not with caution and wisdom but by hasty action frequently become catastrophes. Confused and contradictory explanations immediately following the first proclamation by the governor induced general belief that financial or industrial powers were struggling for control, with the result that what had been at most a local emergency became nation-wide chaos. Prior to the proclamation, the Grand Rapids National Bank, with practically its entire capital and surplus loaned to directors or their enterprises, had possessed a species of doubtful solvency, depending on uninterrupted activity for such stability as it possessed. Following the proclamation, this stability came to an end and, had the officers stopped to consider the situation, they must have seen that ultimate failure was inevitable.

■ It is impossible to conceive any basis for a claim that the governor's proclamation of February 21st afforded justification for preference of deposits made by banks, or that the Michigan legislature could give validity to such preferences by the act of April 7, 1933. Both the governor's proclamation and the act of the legislature attempting to ratify the same were entirely nugatory so far as applied to the distribution of assets of national banks. The proclamation resulted in withdrawals from the Grand Rapids National Bank within ten days after February 22nd of in excess of $560,000 by banks, while public moneys and private deposits were impounded to the extent of 95%. This followed naturally from the clear usurpation of the powers of congress by the state executive. The ultimate result was a 5% distribution to those whose rights were invaded and 100% distribution to many of those whose sanction and advice induced the action.

■ In the case of Davis v. Elmira Savings Bank, 161 U.S. 275, 283, 16 S.Ct. 502, 40 L.Ed. 700, it was said:

"National banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt, by a State, to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the Federal government to discharge the duties, for the performance of which they were created. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court."

A similar holding by Justice Day is found in the case of Van Reed v. People's National Bank, 198 U.S. 554, 557, 25 S.Ct. 775, 49 L.Ed. 1161, 3 Ann.Cas. 1154,—

"National banks are quasi-public institutions, and for the purpose for which they are instituted are national in their character, and, within constitutional limits, are subject to the control of Congress and are not to be interfered with by state legislative or judicial action, except so far as the lawmaking power of the Government may permit."

Also, in the case of Gilbertson v. Northern Trust Co., 53 N.D. 502, 207 N.W. 42, 42 A.L.R. 1353, it was held that no

state statute can override the prohibition of the National Bank Act relating to preferences. See also, 7 C.J. 760.

Application of these principles to the facts established by the record brings the conclusion that plaintiff is entitled to judgment. Findings of fact and conclusions of law, and proposed amendments thereto, may be submitted for signature on or before February 23, 1935, after the filing of which judgment will be entered in favor of plaintiff and against defendant for the amount of the preference with interest at 5% from March 10, 1933, less the amounts of the dividends declared by the receiver with interest thereon.

## NOTE I.

### Summary of Report of National Bank Examiners on February 10, 1933.

| Resources | | Liabilities | |
|---|---|---|---|
| Loans and Discounts | $ 8,473,470.59 | Capital Stock Paid in | $ 1,000,000.00 |
| Overdrafts | 5,514.80 | Surplus Fund | 300,000.00 |
| Interest and other income earned not collected | 111,673.17 | All other Undivided Profits | 45,745.15 |
| Customers' liability account of "Acceptances" | 7,460.00 | Reserved for Depreciation | 4,778.43 |
| | | Reserved for losses | 87,802.43 |
| U. S. Bonds to secure circulation | 1,000,000.00 | Reserves for Interest, Taxes and other expenses accrued and unpaid | 53,515.24 |
| U. S. Bonds and certificates pledged | 440,245.19 | Interest collected, not earned | 8,010.10 |
| U. S. Bonds and certificates not pledged | 131,573.12 | Due to Trust Companies, Banks and Bankers | 1,420,925.03 |
| Premium on U. S. Bonds | 2,228.80 | Certified checks | 17,762.59 |
| Bonds, Securities, etc. (pledged and unpledged) | 1,314,507.86 | Cashier's Checks Outstanding | 14,296.40 |
| Federal Reserve Bank Stock | 45,000.00 | Dividends Unpaid | 955.78 |
| Banking House (Furniture and Fixtures $1) | 2,126,093.99 | Demand Deposits | 6,776,990.26 |
| Other Real Estate Owned | 150,001.33 | Time Deposits | 5,477,164.74 |
| Due from Federal Reserve Bank | 806,108.12 | United States Deposits | 67,476.56 |
| | | Circulation rec'd | 1,000,000.00 |
| Due from Federal Reserve Transit Account | 199,602.93 | Deferred Payments on Building Site | 200,000.00 |
| Due from Trust Companies, Banks and Bankers | 984,187.17 | Cash Letters of Credit and Travelers Checks Outstanding | 7,460.00 |
| Exchange for Clearing House | 97,917.90 | | |
| Cash | 500,172.84 | | |
| Cash Items | 2,341.99 | | |
| 5% Red'n Fund with Treas. U. S. | 50,000.00 | | |
| Clearing items on Main Office and Branches | 20,772.07 | | |
| Prepaid expenses | 14,010.84 | | |
| Total | $16,482,882.71 | Total | $16,482,882.71 |